******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# JULIAN MARQUEZ *v.* COMMISSIONER
# OF CORRECTION
## (SC 19889)

Palmer, McDonald, Robinson, D'Auria and Kahn, Js.*

*Syllabus*

The petitioner sought a writ of habeas corpus, claiming that the state had violated his due process rights by not disclosing an alleged leniency agreement between the state and S, an accomplice who testified against the petitioner at his criminal trial, in violation of *Brady* v. *Maryland* (373 U.S. 83) and its progeny, and by failing to correct S's allegedly false testimony that no such agreement existed. At the petitioner's criminal trial, S testified that it was the petitioner who fatally shot the victim during an armed robbery and that he did not know if he would receive any kind of consideration from the state as a result of testifying. In addition, the prosecutor denied that the state had entered into any formal agreement with S in exchange for his testimony. After the petitioner was convicted of felony murder, the state declined to prosecute S for felony murder. The habeas court denied the petitioner's habeas petition, concluding, inter alia, that no arrangement existed between the state and S that had to be disclosed under *Brady*. The habeas court denied the petition for certification to appeal, and the petitioner appealed to the Appellate Court, which dismissed the petitioner's appeal. The Appellate Court concluded that the habeas court did not abuse its discretion in denying the petition for certification to appeal, and the petitioner appealed to this court, claiming that, contrary to the determination of the habeas court and the Appellate Court, the state had an agreement with S that it had not disclosed to the petitioner in violation of *Brady*. The respondent, the Commissioner of Correction, countered that, although plea discussions between the state and S occurred, there was no *Brady* violation because no agreement was ultimately formalized, and, in any event, S's testimony was immaterial. *Held*:

1. This court declined to address the issue of whether the habeas court had abused its discretion in denying certification to appeal, there having been an alternative basis on which to uphold the habeas court's decision; the petitioner could not have obtained the relief he requested in his habeas petition even if he were to prevail on the issue addressed by the habeas court of whether there had been a leniency agreement between the state and S.

2. This court concluded that, even if the state improperly had failed to disclose the alleged leniency agreement it had reached with S, there was no reasonable likelihood that full disclosure of that agreement or the prosecutor's failure to correct S's allegedly false testimony concerning such an agreement would have affected the judgment of the jury, and, accordingly, there was no due process violation because the lack of any disclosure was immaterial under *Brady*: the state's case against the petitioner was overwhelming, as the petitioner admitted in a statement to the police that he had been present at the murder scene and had held the gun that had been used in the shooting, multiple eyewitnesses identified the petitioner as the shooter, the petitioner had confessed to a fellow inmate that he had shot the victim, and the state presented consciousness of guilt evidence by entering into evidence a letter written by the petitioner; moreover, S's testimony corroborated other evidence introduced at trial, rendering much of S's testimony duplicative, and S was thoroughly impeached on cross-examination.

3. This court declined the petitioner's request to invoke its supervisory authority over the administration of justice and to adopt a rule requiring that the state disclose any representations by a state's attorney, made to a cooperating witness or his attorney, concerning the potential ultimate disposition of the witness' pending criminal case before the witness testifies.

(*One justice concurring separately*)

Argued March 26, 2018—officially released January 15, 2019

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Fuger, J.*; judgment denying the petition; thereafter, the court denied the petition for certification to appeal, and the petitioner appealed to the Appellate Court, *DiPentima, C. J.*, and *Mullins* and *Foti, Js.*, which dismissed the appeal, and the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*James E. Mortimer*, assigned counsel, for the appellant (petitioner).

*Sarah Hanna*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Angela Macchiarulo*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

D'AURIA, J. In this certified appeal, we are asked to consider whether the state violated the due process rights of the petitioner, Julian Marquez, by not disclosing an alleged agreement between the state and Edwin Soler, a testifying accomplice in the petitioner's underlying criminal case, and by failing to correct Soler's allegedly false testimony that no such agreement existed. The state charged the petitioner and Soler with felony murder and robbery related charges following the murder of Miguel Delgado, Jr., during the course of a robbery at Delgado's apartment. After Soler provided testimony implicating the petitioner as the person who murdered Delgado, and after the petitioner was convicted of felony murder, the state declined to prosecute the felony murder charge against Soler. Although the prosecutor denied during the petitioner's criminal trial that the state had entered into any formal arrangement with Soler in exchange for his testimony, he acknowledged that he had presented to Soler's attorney potential "hypothetical" outcomes that could come about if Soler were to testify truthfully against the petitioner.

On appeal to this court, the petitioner asks us to conclude, contrary to the determination of the habeas court and the Appellate Court; *Marquez* v. *Commissioner of Correction*, 170 Conn. App. 231, 240, 154 A.3d 73 (2017); that the state had an agreement with Soler that it had not disclosed to the petitioner in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); see also *Giglio* v. *United States*, 405 U.S. 150, 153, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *Napue* v. *Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959); and in contravention of the fourteenth amendment to the federal constitution. U.S. Const., amend. XIV, § 1. The petitioner also asks us to conclude that the nondisclosure of this agreement was "material," warranting the relief he sought from the habeas court.

We do not consider whether the state had an undisclosed deal with Soler because, even if we assume that such an agreement was struck, we are nonetheless persuaded that there is no reasonable likelihood that disclosure of the agreement would have affected the judgment of the jury. Consequently, we conclude that there was no due process violation because the lack of any disclosure was immaterial under *Brady* v. *Maryland*, supra, 373 U.S. 87, and, therefore, we affirm the judgment of the Appellate Court on that alternative basis.

I

A

At the petitioner's criminal trial, the state presented evidence to establish the following facts, as recounted in our prior review in the petitioner's direct appeal. See

*State* v. *Marquez*, 291 Conn. 122, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009). In 2003, two friends, Mark Clement and Christopher Valle, were visiting Delgado, a mutual friend, at Delgado's apartment in Hartford, where the robbery and murder took place. Id., 126. Others joined them to socialize at the apartment, as was the regular practice on the weekends at this location. Id.

The front door of the apartment opened to the living room, and the apartment had a small game room and a kitchen connected to the living room. Id., 126–27. On the evening of the murder, the living room was illuminated only indirectly by light emanating from the kitchen and the game room. Id., 127. There was a couch on the back wall of the living room that faced the front door. Id. The front door opened into a lighted common hallway. Id., 126.

Several people visited the apartment intermittently throughout the night, while Delgado, Clement and Valle primarily remained in the game room playing games and drinking alcoholic beverages. Id., 127. At around midnight, Valle was preparing to leave the apartment when he exited the game room to say goodbye to Delgado, who was standing just inside the front door attempting to get rid of two men who stood in the hallway. Id. As Valle approached the front door, he saw someone with a gun in the hallway and described him as a Hispanic male in his early twenties, wearing braids and black clothing. Id. The gunman then pointed a handgun directly at Valle and entered the apartment, along with another man. Id.

Valle, Delgado, Clement, and one other man present in the apartment were ordered to sit down on the couch. Id. After the men were gathered on the couch in the living room, the two intruders were only a few feet away for a period of several minutes. Id. Both Valle and Clement had multiple opportunities to see the intruders' faces. Id., 127–28. Valle saw the gunman's face in the brightly lit hallway prior to his entrance into the apartment and, when Valle was seated in the living room, saw the gunman's face illuminated by light from the kitchen. Id., 128. Clement first saw the gunman's face when the gunman entered the apartment and briefly walked into the lighted game room, and, again, when they were all in the living room that was illuminated by the kitchen light. Id.

The intruders ordered the men to surrender their valuables, which they did. Id. The intruders were dissatisfied with Delgado's offer of a small amount of marijuana, believing Delgado had money and drugs elsewhere in the apartment. Id. When the intruders sought access to the bedroom of the apartment, which was attached to the kitchen, Delgado suddenly rushed the gunman and grabbed him, causing a struggle to ensue between Delgado and the gunman. Id., 127–28.

Three shots rang out, and Clement and Valle fled to the game room as Delgado fell to the floor. Id., 128. When it was apparent that the intruders had fled, Valle emerged from the game room to discover Delgado lying in a pool of blood and called the police. Id. When the police arrived, both Valle and Clement stated that they would be able to identify the gunman. Id., 128–29.

Four days later, while making his regular visit to his parole officer, Valle observed the petitioner at the parole office, and immediately recognized him as the gunman. Id., 129. He reported this to office personnel, who conveyed the information to the detective who was leading the investigation into the incident. Id. On the basis of this information, the detective presented Valle with a photographic array consisting of eight photographs fitting the description Valle provided, including one photograph of the petitioner. Id. Valle immediately selected the photograph of the petitioner. Id., 130.

Several days later, the detective contacted Clement and requested that he view a photographic array that included one photograph of the petitioner. Clement was immediately drawn to one photograph but did not want to be too hasty in making an identification. Id. Initially, he eliminated all but two photographs as possibilities but kept returning to one photograph, that of the petitioner, that had initially attracted his attention. Id. Clement stated that his identification was based primarily on his recognition of the petitioner's eyes, which were the same eyes as the gunman. Id., 130–31.

On the basis of Valle's and Clement's identifications, the police obtained an arrest warrant for the petitioner, and executed it several days later. Id., 131. The state filed a five count information charging the petitioner with one count of felony murder, three counts of robbery in the first degree, and one count of attempt to commit robbery in the first degree. Id.

B

The following additional evidence presented at the petitioner's criminal trial is relevant to this appeal. As recounted previously, at trial, the state presented testimony from two of the robbery victims, Valle and Clement, who described the events of the night of the robbery and the murder of Delgado. Both Valle and Clement identified the petitioner as the person who entered with the gun.

In light of these identifications, the petitioner was arrested. He subsequently gave a statement to the police, blaming the murder on Soler. Soler's photograph was placed in a photographic array and shown to Valle, who identified Soler as the person who had assisted the gunman during the course of the robbery. Soler was arrested and charged with the same offenses as the petitioner.

The state called Soler to testify at the petitioner's

criminal trial. Soler's account of the incident in question was largely similar to Valle's and Clement's testimony describing the incident, and Soler testified that the petitioner was the gunman. He also testified that during a chance encounter at the prison medical unit, the petitioner asked Soler to recant the statement he had already given to the police about the incident. Soler also testified that the petitioner questioned him about whether he would testify against the petitioner at his trial.

On direct examination, the prosecutor asked Soler if he had been promised any benefits from the state in exchange for his testimony, which Soler denied. When prodded on cross-examination about his motivation for testifying, Soler stated: "I'm testifying cuz it's the right thing to do." Soler further stated that he was not offered any particular deal by the state and that he did not know whether he would receive any kind of consideration as a result of testifying. Soler also testified that he would not lie about the events of the night in question in order to benefit himself.

Following Soler's testimony, and outside the presence of Soler and the jury, defense counsel requested that the court inquire of the state, on the record, if there were any discussions relayed to Soler about his cooperation being brought to his sentencing court's attention. Specifically, defense counsel questioned whether Soler was told that the felony murder charge would be dropped if he were to testify in accordance with the facts that existed.

In response, the prosecutor explained that, because Soler testified at trial, "some credit perhaps would be due him. What the extent of that credit is, I don't know. I know counsel has suggested that perhaps I would reduce the charge. We've had discussions that maybe that would happen. I can't say that it would. In my discussions with [Soler], I've indicated to him that I hadn't made any promises to him, so we have not come to a disposition or an understanding as to what any testimony would be. . . . [His testimony] potentially ultimately would be presented to a sentencing judge . . . . I don't see how that would not happen."

The court responded by stating that "some favorable consideration is something that [the state] would certainly consider at some point in time, but no promises have been made." The prosecutor replied, "[r]ight." The prosecutor further explained that "[the petitioner] was deciding to elect trial, so essentially for [Soler], we sort of tabled his case because he was available and willing to participate in [the petitioner's] trial." When defense counsel questioned whether Soler's testimony would mean that "his charges could be lowered and he would not face a mandatory minimum of twenty-five years," the prosecutor responded by stating that, "I've not conveyed that to him . . . my conversations with him were

that there are no offers on the table. . . . [H]ow this works out is still yet to be determined."

Soler's defense attorney then stated: "We have discussed the possibility of there being a benefit. We had at one point, I believe, discussed the possibility of coming down to twenty-five years if a variety of things fell into place. I do not believe that I've ever indicated to my client that I had received an offer because there has never been an offer from the state in this case or an indication from the state that they would be inclined to drop the charge . . . ."

The court summarized: "[T]here's been no fixed offer. And that's the way it should be characterized . . . . It doesn't rise to the level of a promise. It's not a promise." The prosecutor affirmed her understanding that, if benefits had been offered in exchange for testimony, the state would have been obligated to disclose such information. The court, therefore, accepted the prosecutor's representation that no agreement existed.

In addition to the testimony of two of the robbery victims, the state also presented a statement the petitioner had given to the police after his arrest, in which he blamed the murder on Soler. The statement was read into the record at trial. In the statement, the petitioner admitted to the police that he had gone to Delgado's apartment on the night of the robbery with Soler, whom the petitioner referred to by his nickname, "Monstruo." He claimed that they briefly stopped in at the apartment, looking to obtain marijuana, which they bought, and, just as they were about to leave, Soler stopped him and was holding a gun. According to the petitioner's statement, Soler proceeded to rob the victims, at one point asking the petitioner to hold the gun for him. The petitioner stated that, after he returned the gun to Soler, Delgado approached and grabbed Soler, leading to a struggle during which Delgado was shot. See footnote 4 of this opinion.

The state also presented testimony at the petitioner's criminal trial from an inmate, David Williams, who had been incarcerated in the same facility as the petitioner and Soler while they awaited trial. Williams had previously known both Soler and the petitioner for about ten years. Williams testified that, while they were incarcerated, the petitioner asked Williams if he knew Soler. When Williams confirmed that he knew Soler, the petitioner informed Williams that Soler was his accomplice in the incident giving rise to the petitioner's arrest and incarceration.

Williams testified that the petitioner eventually told him that "he could help [Williams] with [his] case, [Williams] could help [the petitioner] with his case . . . ." The help that the petitioner sought was for Williams "to give [the petitioner's] lawyer a statement . . . that [Soler] had told [Williams] he had shot somebody . . .

[a]nd that they had somebody else for the murder."

Williams further testified that the petitioner wrote what he wanted Williams to say in the false confession in a letter. The petitioner then instructed Williams to convey the details of the letter to his attorney, who would then get in touch with the petitioner's attorney or investigator. Williams testified that the petitioner "said to memorize it and rip it up when I finish memorizing," before speaking to his attorney. Instead, Williams gave the letter to his attorney and told him how he had received it.[1]

Williams testified that the petitioner was urging him to claim that this was a conversation between Williams and Soler while they were on the same cellblock, even though Williams and Soler were actually on the cellblock together for only "a couple hours" total, and did not speak to each other in that time. Williams testified that the petitioner admitted to Williams that he was actually the person who "shot the kid" that night.

C

The petitioner's defense counsel presented the defense case by cross-examining the state's witnesses to cast doubt on the validity of their testimony. They did not present any witnesses for the defense. Defense counsel argued to the jury in closing that the victims who had identified the petitioner likely chose the petitioner's photograph from the array because his photograph, which was the only one with a white ruler and bright lighting, stood out from other photographs presented to the victims. Defense counsel also asserted that the petitioner's statement to the police was not reliable because he was pressed into giving a statement when the police confronted him with the prior, allegedly tainted identifications by the victims. See footnotes 4 and 5 of this opinion. As for Soler, defense counsel specifically argued that he was likely looking for a deal in exchange for his testimony, telling the jury that Soler was involved and has "been around the block, he has a lot to lose, and he knows that what he could do is he can get off felony murder, not get the twenty-five year mandatory minimum if he comes in here and he says what the state wants him to say and, anyway, he can say it." Defense counsel discredited Williams' testimony as a fabrication by someone facing a manslaughter charge and looking for a deal, and pointed out that Soler and Williams knew each other before they were incarcerated, thereby implying that they might have worked together to pin the crime on the petitioner. Lastly, defense counsel critiqued the ability of the victims to recall certain events during the robbery and the thoroughness of the police investigation.

D

At the conclusion of the trial, the jury found the petitioner guilty of one count of felony murder in viola-

tion of General Statutes § 53a-54c, two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), and one count of attempt to commit robbery in the first degree in violation of § 53a-134 (a) (2) and General Statutes § 53a-49.[2] *State* v. *Marquez*, supra, 291 Conn. 124. The court rendered judgment in accordance with the verdict and sentenced the petitioner to a term of fifty years imprisonment, execution suspended after thirty-five years, and five years of probation.

On direct appeal to this court, the petitioner claimed that the trial court improperly denied his motion to suppress two eyewitness identifications, which violated his right to due process of law under both the state and federal constitutions. Id. We affirmed the trial court's judgment. Id., 167.

E

The petitioner then filed a petition for a writ of habeas corpus, claiming a violation of his due process rights because of the state's failure to disclose material, exculpatory evidence in his underlying criminal trial. Specifically, the petitioner claimed that the state had an undisclosed agreement with Soler that his charges would be reduced in his pending criminal matter in exchange for testimony against the petitioner. He also claimed that the prosecutor knowingly failed to correct Soler's false testimony that he had received no consideration in exchange for his cooperation. If the state had made the appropriate disclosure and correction, the petitioner asserted, the result of his trial would have been different and more favorable to him.

These assertions are based in large part on information exposed during Soler's sentencing. At that time, the prosecutor stated that "the state had represented to [Soler's] counsel that, in the event that [the petitioner] chose to proceed to trial and that [Soler's] testimony would be needed and would, in fact, be forthcoming and be proffered truthfully . . . *the state would sort of come off the felony murder* [*charge*] and charge various counts of robbery or some of the substantive offenses in lieu of the felony murder since that would have a minimum mandatory of twenty-five years to serve. And that was discussed with the victim's family and other victims as well." (Emphasis added.) Notably, after Soler testified at the petitioner's trial, the prosecution chose not to pursue the felony murder charge originally brought against him. Instead, he was sentenced to a total term of twenty years of imprisonment, execution suspended after nine years, and five years of probation, for two counts of robbery in the first degree and attempt to commit robbery in the first degree.

Notwithstanding the phrasing he used at sentencing, at the petitioner's habeas trial, Soler's prosecuting attorney testified that his statement at Soler's sentencing

"was referring to discussions subsequent to his testimony, not prior to" it. He also stated that the discussion he probably was referring to was when he "discussed with the [victim's] family whether or not they would object to [Soler] having the charge other than felony murder . . . ." He also stated that "[w]e didn't codify or create any deals. . . . So if I did discuss or say or suggest things while [Soler's] case was pending, it would be in sort of the hypothetical that maybe we could do things." He insisted that, "at that time that [Soler] testified, I made no offers . . . ."

The prosecutor further explained that his decision not to pursue the felony murder charge was, instead, "based upon [Soler's] cooperation, based upon his completeness and truthfulness in his statement from day one when he got arrested," and because "felony murder . . . carries a mandatory twenty-five year sentence. I didn't think that was an appropriate sentence for his role," given that he was not the gunman. He also testified that, as a general policy in all criminal matters, he does not "make a deal [with any cooperating witness] because it doesn't pay as a prosecutor to try to make a deal upfront because you don't know how it's going to work out" with the quality of the witness' testimony.

The habeas court denied the petitioner's habeas petition, concluding that none of the testifying witnesses in the petitioner's underlying criminal trial had agreements promising them benefits in exchange for their testimony, and, thus, no *Brady* violation occurred. The petitioner sought certification to appeal from the judgment, claiming that, among other things, the habeas court made a clearly erroneous factual finding that there was no agreement between the state and Soler at the time of his testimony in the petitioner's underlying criminal trial. The habeas court denied the petition for certification to appeal. The petitioner then appealed to the Appellate Court, which dismissed the petitioner's appeal, concluding that the habeas court did not abuse its discretion in denying the petition for certification to appeal. *Marquez* v. *Commissioner of Correction*, supra, 170 Conn. App. 240–41.

We granted the petitioner's petition for certification to appeal, limited to the following issues: First, "[d]id the Appellate Court properly conclude that the habeas court did not abuse its discretion in denying the petitioner's petition for certification to appeal?" Second, "[i]f not, did the habeas court properly find that the state did not fail to disclose, in violation of *Brady* v. *Maryland*, [supra, 373 U.S. 87], and its progeny, material impeachment evidence concerning plea discussions between the state and a key state's witness?" *Marquez* v. *Commissioner of Correction*, 324 Conn. 925, 925–26, 155 A.3d 1269 (2017).

II

The petitioner argues that the state created an informal leniency agreement with Soler, conveying to him that, in exchange for testimony favorable to the state, he would receive a lesser charge. The petitioner argues that this undisclosed agreement violates *Brady* and its progeny, as did the state's failure to correct Soler's false testimony that no such agreement existed. The petitioner also asks us to conclude that the nondisclosure of Soler's agreement and his uncorrected false testimony were material under the *Brady* doctrine. *Brady* v. *Maryland*, supra, 373 U.S. 87. The respondent, the Commissioner of Correction, argues that, although plea discussions took place, no agreement was ultimately formalized and, thus, no *Brady* violations took place. The respondent further argues that Soler's testimony was immaterial. We agree that, under due process standards, Soler's testimony was immaterial, and, therefore, we have no occasion to reach the question of whether an agreement was formed between Soler and the state.

A

Before turning to the merits of the case, we must first address the habeas court's decision to deny the petitioner's petition for certification to appeal. General Statutes § 52-470 (g) provides in relevant part that "[n]o appeal from the judgment rendered in a habeas corpus proceeding . . . may be taken unless the appellant . . . petitions the judge before whom the case was tried . . . to certify that a question is involved in the decision which ought to be reviewed by the court having jurisdiction and the judge so certifies." This statute "prevents a reviewing court from hearing the merits of a habeas appeal following the denial of certification to appeal unless the petitioner establishes that the denial . . . constituted an abuse of discretion by the habeas court." *Kaddah* v. *Commissioner of Correction*, 299 Conn. 129, 135, 7 A.3d 911 (2010). In the present case, the habeas court found that no arrangement existed between the state and Soler that had to be disclosed to the defense and declined to find that the question merited review by an appellate court.

Ordinarily, a petitioner must overcome the denial of certification to appeal by proving that the habeas court abused its discretion on the basis of one of three factors. Id., 136. We previously have concluded, however, that "we need not decide whether the habeas court abused its discretion in denying certification to appeal" when there is "an alternat[ive] ground for affirming the decision of the habeas court" and the petitioner, therefore, "cannot obtain the relief he requested in the present petition," even if he were to prevail on the question addressed by the habeas court. Id., 136. In the present case, because the petitioner's claim fails on the basis of materiality, regardless of whether the habeas court properly denied certification on the question of whether

there was an agreement, we do not address the habeas court's decision to deny certification. We instead affirm on that alternative basis.[3]

### B

We begin our analysis with an overview of the principles that govern a claim that the state failed to disclose an agreement with a cooperating witness in exchange for the witness' testimony. The fourteenth amendment to the United States constitution demands that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const., amend. XIV, § 1. Due process principles require the prosecution to disclose to the defense evidence that is favorable to the defendant and material to his guilt or punishment. *Brady* v. *Maryland*, supra, 373 U.S. 87; see also *State* v. *Ortiz*, 280 Conn. 686, 717, 911 A.2d 1055 (2006). In order to obtain a new trial for improper suppression of evidence, the petitioner must establish three essential components: (1) that the evidence was favorable to the accused; (2) that the evidence was suppressed by the state—either inadvertently or wilfully; and (3) that the evidence was material to the case, i.e., that the accused was prejudiced by the lack of disclosure. See, e.g., *State* v. *Ouellette*, 295 Conn. 173, 185, 989 A.2d 1048 (2010).

The state's failure to disclose an agreement with a cooperating witness may be deemed to be the withholding of exculpatory evidence. Impeachment evidence "falls within *Brady*'s definition of evidence favorable to an accused." (Internal quotation marks omitted.) Id. Impeachment evidence is "broadly defined" in this context as evidence that could potentially alter the jury's assessment of a witness' credibility. (Internal quotation marks omitted.) *State* v. *Jordan,* 314 Conn. 354, 370, 102 A.3d 1 (2014). Specifically, we have noted that "[a] plea agreement between the state and a key witness is impeachment evidence falling within the . . . *Brady*" doctrine. (Internal quotation marks omitted.) *State* v. *Ouellette*, supra, 295 Conn. 185. An undisclosed agreement for benefits between Soler and the state falls within the broad definition of impeachment evidence.

In addition to alleging failure to disclose an agreement, the petitioner also argues that an additional due process violation occurred when the state failed to correct Soler's alleged false testimony at trial regarding the absence of an agreement. We have explained that "[d]ue process is . . . offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears." (Internal quotation marks omitted.) Id., 186; see also *Napue* v. *Illinois*, supra, 360 U.S. 269. Even if the denial of a leniency agreement is not outright false, but only "substantially mischaracterizes" the nature of the agreement, we have indicated that "the state is obliged to correct the misconception." (Internal quotation marks omitted.) *State*

v. *Ouellette*, supra, 295 Conn. 186; see also *Giglio* v. *United States*, supra, 405 U.S. 153; *Napue* v. *Illinois*, supra, 269–70.

For the purposes of our analysis, we will assume, without deciding, that the state improperly failed to disclose impeachment evidence concerning the alleged agreement it reached with Soler. We therefore turn to consider whether the lack of any disclosure of such an agreement to the defense and the failure to correct Soler's testimony that no such agreement existed were material.

We begin by noting that determining materiality presents a question of law subject to plenary review. See, e.g., *State* v. *Ortiz*, supra, 280 Conn. 720; see also *Jones* v. *State*, 328 Conn. 84, 102–103, 177 A.3d 534 (2018).

Evidence is material when there "would be a reasonable probability of a different result" if it were disclosed. (Internal quotation marks omitted.) *State* v. *Jordan*, supra, 314 Conn. 370. A reasonable probability exists if the evidence "could reasonably . . . put the whole case in such a different light as to undermine confidence in the verdict." (Internal quotation marks omitted.) *State* v. *Ortiz*, supra, 280 Conn. 717. Materiality does not require, however, a "demonstration . . . that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." (Internal quotation marks omitted.) Id., 717–18. Instead, the operative inquiry is whether, in the absence of the evidence, the defendant "received a fair trial . . . resulting in a verdict worthy of confidence." (Internal quotation marks omitted.) Id., 718.

In the context of a false testimony *Brady* violation, the standard for materiality is "significantly more favorable to the defendant" than it is with other forms of exculpatory evidence. (Internal quotation marks omitted.) *State* v. *Jordan*, supra, 314 Conn. 370. A conviction obtained through uncorrected false testimony "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." (Internal quotation marks omitted.) Id., 370–71. In other words, "reversal is virtually automatic . . . *unless the state's case is so overwhelming that there is no reasonable likelihood that the false testimony could have affected the judgment of the jury*." (Emphasis in original; internal quotation marks omitted.) Id., 371.

This calls for "a careful review of that testimony and its probable effect on the jury, weighed against the strength of the state's case and the extent to which [the defendant was] otherwise able to impeach [the witness]." (Internal quotation marks omitted.) Id. "[E]vidence that may first appear to be quite compelling when considered alone can lose its potency when weighed and measured with all the other evidence, both

inculpatory and exculpatory. Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest." (Internal quotation marks omitted.) *State* v. *Wilcox*, 254 Conn. 441, 455, 758 A.2d 824 (2000). To aid in this comparison, a court may take judicial notice of the underlying criminal trial transcripts during the petition hearing or on appeal. See, e.g., *Andrades* v. *Commissioner of Correction*, 81 Conn. App. 538, 540, 840 A.2d 1198 (2004).

C

Applying these principles to the present case, we must consider Soler's alleged false testimony that he was testifying solely "cuz it's the right thing to do," that the prosecutor "didn't" offer him a plea deal, and that he did not expect to get any consideration for his testimony in comparison to all of the other evidence presented at the criminal trial. The petitioner claims that, if the jury had known that, in exchange for his testimony, "the state would sort of come off the felony murder" charge, there is a reasonable likelihood that the jury would have seen the case differently. We conclude, however, that there is no reasonable likelihood that full disclosure of any agreement or Soler's allegedly false testimony would have brought about a different result at trial.

First, it is important to point out that, at his criminal trial, there was little question that the petitioner was present at the scene. The state presented a statement given by the petitioner to the police acknowledging that he was present during the incident that caused Delgado's death, and that he had, at some point, held the gun used in the murder.[4] The primary issue in the case, if the petitioner's statement is credited,[5] therefore, was whether the petitioner participated in the robbery that led to Delgado's murder.[6]

There was ample evidence presented at trial to show not only that the petitioner actively participated in the robbery, but that he also fired the shots that killed Delgado. Valle clearly identified the petitioner to be the gunman. He testified that he first observed the petitioner in a "brightly lit" hallway. Then, after entering the apartment, the petitioner was only "[i]nches" away from Valle's face. Even though the living room was unlit, Valle stated that he "could see [the petitioner] real good" because of the light pouring in from other rooms. When speaking to the police, Valle was able to give a detailed description of the petitioner, including his approximate height, hairstyle, hair length, build, approximate age, and complexion. Additionally, Valle noted that, when he first saw the petitioner at the apartment, he thought that the petitioner "exactly" resembled someone else that Valle knows. Valle specifically told the police at the time of the murder that his observation of the petitioner and Soler would allow him to

identify the two men if given the chance.

Although two men came into the apartment looking to rob the occupants, the man that Valle positively identified as the petitioner was the same man who, he testified, displayed the gun when he came into the apartment, directed Valle and the others to sit on the couch, and indicated that his gun was "on safety." The other individual "acted like he had [a gun], but he never showed it." It was the petitioner whom Valle described as struggling with Delgado when the gun went off.

When Valle saw the petitioner again at the parole office—out of context from any investigation or prompting—Valle immediately recognized him. When subsequently presented with a photographic array, "[i]t only took [Valle] three seconds" to identify the petitioner as "the one [who] had the gun." In response to a question from the prosecutor as to how certain he was of his identification of the petitioner as the murderer, Valle replied, "I'm positive." Simply put, Valle provided strong evidence of the petitioner's guilt by identifying him during a chance encounter, selecting with certainty his photograph from an array, identifying him in court, and providing credible, corroborated testimony about the incident in question.

Clement provided testimony consistent with Valle's testimony. Clement confirmed that, on the night of the murder, "[i]t was light . . . enough to see" in the living room, as light was provided by adjoining rooms that did not have doors. Clement came within "[a] foot or two" of the robbers, and handed the petitioner his watch, providing him ample opportunity to observe the petitioner and Soler. Clement told the responding police officers, "I could give you a good description of what [the petitioner and Soler look] like, and if you were to catch them, I could point them out. . . . More with the guy with the gun. . . . [T]he guy with the gun, I could— I remembered his clothes pretty good. . . . And his eyes I could probably catch if I saw him again." Clement testified that he had the presence of mind during the robbery to make a concerted effort to remember the gunman's appearance because, based on a prior experience, he knew that he might have to identify the perpetrator. He noted: "I was enough minded to at least to be able to look the guy in his eyes."

Upon viewing the photographic array, Clement stated that, "right away, there was one photograph that caught my attention. . . . And then I paused for a second and I wanted to look at the other ones because I didn't want to just give [the detective] an answer right away. I wanted to make sure I got it right. . . . And I looked at another guy . . . briefly, but then I eventually went back to my first instinct." In response to a question from the prosecutor as to how certain Clement was of his identification of the petitioner as the murderer, Clement testified, "I was pretty sure, 90 percent." Clem-

ent stated that what made him certain about the identification was the petitioner's "eyes. . . . [I]t's more his eyes and pretty much his facial features. I could pretty much tell." Clement's memory of the petitioner's facial features lends credibility to his identification, as opposed to reliance on a changeable feature, such as the petitioner's facial hair. At the end of his testimony, Clement made an in-court identification of the petitioner as the person who was carrying the gun during the robbery.

In short, both Valle and Clement presented persuasive testimony, selecting with confidence the petitioner's photograph from a photographic array, identifying him in court, and providing testimony consistent with one another's accounts of the evening.

In addition to Valle's and Clement's strong testimony, the state provided confession and consciousness of guilt evidence. The petitioner's fellow inmate, Williams, testified that the petitioner had confessed to him that he was the one who shot Delgado that night. Williams testified that the petitioner stated that he used an "old black Colt .45" gun and shot Delgado in the neck while Soler ran away.

Additionally, consciousness of guilt evidence was presented at trial through Williams' testimony that the petitioner sought to trade favors with him by suggesting that each testify falsely at each other's trials. Williams testified that the petitioner wrote him a letter containing a false story, reversing Soler's and the petitioner's roles, with Soler confessing to the murder to Williams in jail. The petitioner instructed Williams to communicate the letter's contents to his own attorney, who would convey it to the petitioner's attorney and then destroy it. The letter, however, was entered into evidence and contained details largely corroborating Soler's testimony, save for the role reversal. See footnote 1 of this opinion.

Soler's testimony served only to corroborate independent testimony from eyewitnesses Valle and Clement, testimony from Williams, who heard a direct confession from the petitioner himself, and the petitioner's written confession attempting to frame Soler as the gunman. Soler provided very little information about the incident that was not also revealed by Valle, Clement, Williams, and by the petitioner's own written words, rendering much of Soler's testimony duplicative.

Moreover, Soler was thoroughly impeached on cross-examination. Although he did not admit to receiving any benefit, he did admit that he was hoping his attorney could do "[w]hatever she can do" to make him a good deal on the felony murder charge. Soler also testified that he did not speak to the police until after he was arrested because he was hoping to get away with the crimes. In other words, he conceded opportunistic aspirations for the disposition of his own case, regardless

of whether a formal deal existed. Throughout cross-examination, defense counsel continually focused on Soler's motivation to testify consistently with the state's narrative of the case. In fact, Soler admitted that it was only after he was arrested that he was willing to cooperate. Defense counsel also impeached Soler in other ways, underscoring Soler's drug use, voluntary participation in the underlying armed robbery, and the fact that his nickname on the streets is Monstruo—the Spanish word for "monster." Defense counsel told the jury, during closing arguments, that Soler likely testified as a means to have the felony murder charge, and its mandatory minimum sentence, dropped in exchange for testimony favorable to the state.

Thus, even if jurors believed Soler's allegedly false testimony that he did not have a deal with the prosecutor, their impression was harmful only to the extent that Soler's testimony provided unique value to the state's case. Given the testimony of Valle, Clement, Williams, and the handwritten confession evidence, we are not persuaded that Soler's testimony proved significant aside from its consistency with multiple other witnesses. When Soler's testimony is weighed against the overwhelming strength of the state's case, as we are obligated to do, the elevated standard for materiality is not met.

In support of his materiality claim, the petitioner principally asserts that "it is likely that Soler's testimony was extremely influential on the jury," and, thus, Soler's hidden motives were "not harmless." He supports this contention by emphasizing that there were "problems surrounding the state's other witnesses." We find these problems to be largely illusory.

Most notably, the petitioner contends that "the tenuous credibility of the testimony of Clement, Valle and Williams," was "insufficient to render Soler's false testimony harmless . . . ." Specifically, the petitioner contends that Clement "felt that he 'had to pick somebody' " in the photographic array and was "vacillating between two individuals in the lineup." This is an incomplete representation of Clement's testimony. Clement testified that he "was pretty sure, 90 percent" confident in his identification of the petitioner as the gunman. He also testified that he intentionally hesitated in making his identification out of an abundance of caution because he "wanted to make sure [he] got it right." He also provided detailed testimony about his memory of the petitioner's facial features, which he purposely studied at the time of the incident because he had the presence of mind to know that he may have to identify the gunman in the future. Moreover, he testified that the officers who presented the photographic array to him "*didn't* make it sound like" he "had to pick somebody." (Emphasis added.)

The petitioner also asserts that Valle was a weak

witness because he "was consuming alcohol on the evening of the homicide" and "did not even witness the fatal shot that was fired . . . ." He also emphasizes that "Valle was serving a sentence in a criminal matter and had not been abiding by the conditions of his 'addiction program.' " These qualifications, while true, are unpersuasive in discrediting Valle's testimony.

Although Valle was consuming alcohol that night, he characterized his consumption as drinking "a little bit" and noted that the alcohol he purchased was shared among four individuals. Notably, there was no testimony presented by either Valle or Clement that they were drunk or had consumed excessive amounts of alcohol that evening. At best, the extent to which Valle's alcohol consumption weakens or impairs his testimony is unclear.

The petitioner's argument that Valle did not observe the fatal shot being fired is unconvincing. Although he had fled to another room by that time, Valle still had the opportunity to "see [the petitioner] real good" and was "positive" when he identified the petitioner as the gunman in a photographic array. Although Valle did not know with eyewitness certainty that the petitioner was the one who fired the fatal shot, he did witness the petitioner as the only one with a visible gun and observed that Delgado had begun physically fighting with the armed petitioner immediately before Valle exited the living room and the gun discharged.

And, although it is true that Valle was serving a sentence in a criminal matter and was participating unsuccessfully in an addiction program, these facts do not discredit his testimony. On redirect examination, the prosecutor underscored the fact that, in Valle's pending case, he did not use his cooperation in the present case to gain any benefit for the disposition of his own case. As for the noncompliance with his addiction program, in the absence of any additional facts, we see no reason why it would discredit his testimony in any meaningful way.

Finally, the petitioner discounts Williams' testimony on the basis of his admission "that he had an interest in testifying for the state and an expectation of a benefit . . . ." Although Williams was somewhat of a "jailhouse snitch," he did testify that it was the petitioner who, in fact, sought him out for help in framing Soler as the gunman. The prosecutor fully exposed Williams' self-interest, appropriately leaving it to the jury to weigh his credibility. Notwithstanding Williams' status as a "jailhouse snitch," the bottom line remains that his testimony concerning the petitioner's story about the events that night was consistent with the other witnesses' accounts. More important, Williams provided the letter as physical evidence corroborating the petitioner's attempt to engineer false testimony to frame Soler as the shooter. Biased or not, Williams' value as a witness

stems from his possession of the physical evidence exposing the petitioner's plot to blame his accomplice, demonstrating powerful consciousness of guilt evidence that no level of self-interest could negate.

Because we do not find the testimony of Clement, Valle, and Williams "problematic," as the petitioner urges, we disagree that "[e]xposing Soler's motives would have significantly detracted from the [jury's] crediting" the testimony of the other witnesses. Given how strong the state's case was, exposing Soler's motives would not have made a meaningful difference.

In the present case, "the state's case [was] so overwhelming that there is no reasonable likelihood that [Soler's] false testimony could have affected the judgment of the jury." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Jordan*, supra, 314 Conn. 371. After weighing Soler's testimony, its probable effect on the jury, the strength of the state's case, and the extent to which defense counsel was able to impeach Soler, we conclude that Soler's allegedly false testimony and the prosecutor's failure to correct it were immaterial under *Brady*. See id.

### III

The petitioner also urges us to exercise our supervisory authority "to require that the state disclose any representation by a state's attorney, made to a cooperating witness, or [his] attorney, concerning the potential ultimate disposition of [the witness'] pending criminal case prior to testifying." Although we decline the petitioner's request in this particular case, we are constrained to comment on the state's practice of informal, off-the-record leniency understandings with cooperating witnesses.

These understandings, like the one in the present case, often involve a prosecutor's suggesting—although not promising—that a favorable recommendation to the sentencing judge and/or a reduction in the charges against the witness might be forthcoming in exchange for the witness' testimony inculpating another defendant. See, e.g., *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 363, 71 A.3d 512 (2013); *Hines* v. *Commissioner of Correction*, 164 Conn. App. 712, 717–23, 138 A.3d 430 (2016). Often such representations are made only to the witness' counsel, while the prosecutor's communication with the witness makes clear that there is no promise. Under such circumstances, the prosecutor may not actually know if any representations of possible leniency have been conveyed by the witness' counsel to the witness. Thereafter, if, before the jury, the witness denies that there is any actual "agreement" or "deal," the prosecutor can accurately state, as the respondent argues in this case, that he does not have a reason to know if the witness is being untruthful. Although it might very well be accurate that

no definitive promises have been made by the state, and, even if any possible outcomes as described to counsel might be "tentative," experienced counsel operating in a courthouse in which he or she is familiar with the practices of prosecutors and presiding judges can comfortably advise the witness of the possible credit that might follow from his testimony. Thus, these "hypothetical" outcomes serve as a real incentive to motivate a witness to testify for the state.

Left out of this equation, however, is the jury. See *Adams* v. *Commissioner of Correction*, supra, 309 Conn. 369–73 (collateral review of conviction obtained by false testimony requires "a careful review of that testimony and its probable effect on the jury"). These vague understandings can prevent defense counsel from effectively impeaching the witness for bias, perhaps leaving jurors "with the impression . . . that [the witness did not have] any incentive to testify favorably for the state." *State* v. *Jordan*, 135 Conn. App. 635, 667, 42 A.3d 457 (2012), rev'd in part on other grounds by *State* v. *Jordan*, 314 Conn. 354, 102 A.3d 1 (2014). Jurors are not well versed in the nuanced vagaries of such leniency agreements. Yet, we rely on jurors to assess a witness' credibility—including a witness' motivation to testify—while withholding from them critical information that would help them assess just how motivated that witness might be. This practice, therefore, carries with it risks that threaten the efficient and fair administration of justice.

First, and most obvious, a defendant's constitutional rights may be violated if information about a potential plea agreement likely to bear on a witness' motivation to testify is not disclosed. As a result, a court in a later collateral proceeding might indeed conclude that the state's disclosure of its pretrial understandings was insufficient under *Giglio* v. *United States*, supra, 405 U.S. 153, *Brady* v. *Maryland*, supra, 373 U.S. 87, and *Napue* v. *Illinois*, supra, 360 U.S. 269. See, e.g., *Adams* v. *Commissioner of Corrections*, supra, 309 Conn. 363–64, 365 n.11 (although prosecutors intentionally created "firewall" so they would not know what promises were given to cooperating witness, state had duty to disclose witness' plea agreement). Even if the failure to disclose is ultimately found not to be material, the practice of vague understandings can lead to lengthy posttrial inquiries, delaying finality and consuming resources. For example, in the present case, the habeas court was faced with reconstructing and examining, years after the fact, communications that took place—both on the record and off-the-record—during a cooperating witness' pretrial plea negotiations, during that witness' testimony at the trial of his accomplice, or during the witness' ultimate sentencing hearing. This collateral fact-finding might include, as in the present case, attempts to secure testimony from prosecuting authorities or the cooperating witness' counsel. Issues of privi-

lege, availability, and faulty memories are likely to abound.

Second, the absence of an express agreement may require a defendant to explore other means to reveal to the jury a cooperating witness' motivation to testify. For example, in an attempt to inform the jury about a system in which promises are not explicitly made but understandings are drawn from pretrial discussions, defendants might resort to calling expert witnesses to attempt to explain to the jury just how much leniency a cooperating witness can expect from his testimony. See, e.g., *Servello* v. *Commissioner of Correction*, 95 Conn. App. 753, 763, 899 A.2d 636 (petitioner claimed that his defense counsel should have called expert witness at trial to testify whether informant "expected to receive, or already had received, consideration in exchange for his cooperation"), cert. denied, 280 Conn. 904, 907 A.2d 91 (2006); see also *United States* v. *Noze*, 255 F. Supp. 3d 352, 353 (D. Conn. 2017) (defendant sought to offer expert testimony about " 'the incentives and the benefits cooperating witnesses receive for testifying' "); *State* v. *DuBray*, 317 Mont. 377, 389–90, 77 P.3d 247 (2003) (defendant sought to present expert testimony regarding possible benefits that incarcerated inmate may receive for favorable testimony). This approach has its own disadvantages. In addition to increased costs, it leaves the jury to choose between competing experts without a framework from which to properly assess the significance of those experts' opinions.

Finally, this court or the Rules Committee of the Superior Court could also conclude that this practice should be addressed by the exercise of supervisory authority or the passage of a rule of practice. For example, in federal courts, "it is standard practice in federal criminal cases for the prosecution to enter into a written cooperation agreement that memorializes the potential benefits that may ensue as a result of a cooperating [witness'] testimony." *United States* v. *Noze*, supra, 255 F. Supp. 3d 354. The agreements usually contain an express provision that the government is not making any promises as to the level of leniency and that the recommendation for a reduction in the sentence will be based on the level of cooperation provided. Cf. U.S. Sentencing Guidelines Manual § 5K1.1 (2016) (upon motion of government that defendant has provided substantial assistance in investigation or prosecution of another, court may depart from sentencing guidelines).

Thus, the risks attendant to the practice of entering into vague, off-the-record, cooperation agreements are completely avoidable. Understandably, the state is concerned about making actual, enforceable promises to the cooperating witness because it does not want to commit to a precise outcome until the witness has testified. However, outlining the terms of its agreement,

including the charges and the maximum and minimum exposure to which it has agreed that the witness will be exposed, does not constrain the state any more than the practice of entering into an informal understanding with defense counsel. The state retains the option to deny the witness an opportunity to plead to a reduced charge or to receive a lenient sentence if the witness rescinds the agreement to testify truthfully.

Finally, the state can avoid the risk that a cooperating witness will engage in perjury by asking the witness leading questions about the nature of the witness' agreement with the state. See *Greene* v. *Commissioner of Correction*, 330 Conn. 1, 27 and n.18, 190 A.3d 851 (2018). Some trial courts find that the better practice is to make a clear record of the nature of the agreement or understanding, including the anticipated charge(s) and the maximum and minimum penalties for those charges. For example, prior to the witness' testimony, on the record but outside the presence of the jury, the court may ask the prosecutor to outline the nature of the agreement—the charges and maximum and minimum penalties—in the presence of the witness, the defendant, and all counsel. Requiring the state to negotiate the parameters of its cooperation agreement with the witness ensures the integrity of the process and protects the state, the witness, and the defendant against the consequences of an undefined vague agreement. This approach not only makes a clear record of the agreement, it eliminates the risk that the disclosure is insufficient or that the witness will testify untruthfully about the nature of the agreement and his expectations. Both sides can examine the witness and argue to the jury the motivation of the witness to testify and how that impacts, if at all, the witness' credibility.

IV

"We ordinarily invoke our supervisory powers to enunciate a rule that is not constitutionally required but that we think is preferable as a matter of policy." (Internal quotation marks omitted.) *State* v. *Medrano*, 308 Conn. 604, 630, 65 A.3d 503 (2013). Our supervisory powers "are an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Emphasis in original; internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 815, 709 A.2d 522 (1998), quoting *State* v. *Holloway*, 209 Conn. 636, 645, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989). We decline to invoke our supervisory authority under these circumstances, trusting that the above discussion will encourage prudence on the state's part in its dealings with cooperating witnesses.

Because we conclude that, in the present case, the testimony in question was immaterial under the third prong of *Brady* and, therefore, that there was no violation of the petitioner's due process rights, we need not comment further on the state's disclosure of any pretrial discussions with Soler. Therefore, we affirm the judgment of the Appellate Court on the alternative basis of immateriality.

The judgment of the Appellate Court is affirmed.

In this opinion McDONALD, ROBINSON and KAHN, Js., concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] The letter was entered as a full exhibit during the trial, and Williams read it in its entirety as part of his testimony. In relevant part, the letter provided Williams with the following instructions about what to tell his attorney: "[Soler] asked if you heard about the kid that got killed on Babcock back in December . . . . So [Soler] starts telling you that they got somebody else for the murder, some kid named Julian [the petitioner] . . . . [Soler] was like oh, we'll fuck that nigger. That kid [the petitioner] told on [Soler] that's why he's in jail. . . . [Soler is] not really stressing it because they think [the petitioner] did it. But [Soler] really did it. . . . You got a little nosy and asked him how it went down. And [Soler] told you that [the petitioner] asked him to come with him to buy some weed from Babcock Street. . . . [Delgado] had told him that he can get him some good shit . . . [b]ut . . . to come back in the morning . . . . Then [Soler] said that he was watching where [Delgado] went in the house so when [Delgado] gave [the petitioner] the weed and was walking [the petitioner] out, [Soler] said that he went into his coat pocket and pulled out a 45. He said it was an old black Colt. . . . [Soler] pulled it out, pointed it and started waving it around . . . . [Soler] sat everybody down . . . in the apartment . . . . [Soler] told [Delgado] take me to the back room where you got the shit . . . when [Delgado] got up and then turned around and tried to grab the gun so that [Soler] just squeezed the trigger. Then they started struggling and . . . the other dudes in the house ran. And [the petitioner] ran out on [Soler] . . . . Then [Soler] ran outside, saw [the petitioner] in the front yard. . . . [E]ven though [the petitioner] didn't know [Soler] had a gun or was going to rob [Delgado] that [the petitioner] still shouldn't have run out . . . . But for being a bitch now they think [the petitioner] did it so he's straight."

[2] The jury found the petitioner not guilty of one count of robbery in the first degree.

[3] The respondent urges us not to reach the issue of materiality because neither the habeas court nor the Appellate Court specifically reached that issue. Although this is true, reaching the issue is fair to the parties because the petitioner has asked us to reach the issue in this certified appeal, it is a question of law arguably within the scope of our certification, and both parties have briefed the issue—including the petitioner in both his brief and reply brief. See *Kaddah* v. *Commissioner of Correction*, supra, 299 Conn. 136 n.10. Moreover, because the petitioner must prove materiality to succeed in a *Brady* challenge, we need not address the underlying question of whether the state had an undisclosed arrangement with Soler if the lack of disclosure would otherwise be immaterial.

[4] The statement was read into the record at trial in relevant part as follows: "[Soler and I] went back up to the third floor apartment [on Babcock Street]. The dude was in the front porch. We told him we'd take the three dimes [of marijuana].

"The front door was open so he told us to come into the house. I came in and waited in the living room and [Soler] waited in the hallway. The dude went into one of the rooms and came out and gave me the weed and I gave him the money. I was ready to walk out and the dude was right behind me. [Soler] told me to turn around and go back in. [Soler] was holding a big black automatic gun. He was pointing it at everyone. . . . [Soler] told everyone to sit on the couch . . . [and] to run their pockets . . . .

"[Soler] told me to take the gun and hold it. I grabbed the gun and [Soler] started to take everybody's stuff including money, weed, and jewelry. . . .

I passed [Soler] back the gun . . . . [Soler] told [Delgado] to get up and show him where the stuff was. [Delgado] got up and he hesitated and then he turned around and grabbed [Soler]. They started struggling . . . . I heard the first shot . . . . I ran downstairs . . . . I then heard more shots coming from inside the building."

[5] The petitioner contended at a suppression hearing during his criminal trial and during closing argument that this statement was coerced. However, at the hearing on the motion to suppress the statement, the petitioner testified that he truthfully told the detectives that he "went to [the] apartment, [he] committed the crime, it just was [he] didn't have the gun, it was [Soler] who was the guy who did the shooting . . . ." Although the petitioner testified at the suppression hearing that he never reviewed the statement to verify its veracity, and defense counsel, during closing argument, noted that the petitioner felt that he had to "give [the police] what they wanted to hear," the petitioner has never disputed that the statement is correct to the extent that it placed him at the scene of the crime.

[6] The state argued at trial that the petitioner was guilty of felony murder if he, "either alone or with [Soler], was committing or attempting to commit robbery or fleeing therefrom and he or [Soler] caused [Delgado's] death in the course of doing that or fleeing from that . . . ."

───────────────────────