******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* LARISE N. KING
## (SC 20632)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Dannehy and Bozzuto, Js.

### *Syllabus*

The defendant appealed from the judgment of conviction of murder as an accessory and conspiracy to commit murder. The defendant, who had waived her right to a jury trial and elected to be tried by a three judge panel pursuant to statute (§§ 53a-45 (b) and 54-82 (b)), claimed, inter alia, that the evidence was insufficient to support the judgment of conviction and that her jury trial waiver was not made knowingly, intelligently and voluntarily because the canvassing court improperly had failed to explain to her that the three judge panel did not need to be unanimous to convict. *Held*:

The evidence was sufficient to establish the defendant's guilt of murder as an accessory and conspiracy to commit murder.

The fact that the defendant's alleged accomplices and/or coconspirators had not been charged in connection with the victim's homicide did not inherently cast doubt on the sufficiency of the evidence against the defendant.

This court invoked its supervisory authority over the administration of justice to require that a canvassing court specifically advise a defendant who elects to waive his or her right to a jury trial and to be tried by a three judge panel that, unlike with a twelve member jury, which must reach a unanimous verdict in order for a defendant to be convicted, a three judge panel need not be unanimous and that only two members of the three judge panel need to agree for a conviction.

The court concluded that this new rule should apply to the defendant's case and that fairness and justice demanded that it reverse the defendant's conviction and order a new trial.

Even if this court assumed that the three judge panel in the present case engaged in deliberations before the close of evidence and the submission of the case to the panel, a three judge panel, unlike a jury, is not constitutionally prohibited from beginning its deliberations prior to the close of evidence.

Argued December 20, 2023—officially released August 8, 2024*

* August 8, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Procedural History*

Substitute information charging the defendant with the crimes of murder as an accessory and conspiracy to commit murder, brought to the Superior Court in the judicial district of Fairfield and tried to a three judge court, *Richards*, *Hernandez* and *Dayton*, *Js.*; thereafter, the court denied the defendant's motion for a judgment of acquittal; finding of guilty, with *Richards*, *J.*, dissenting; subsequently, judgment was rendered in accordance with the verdict, from which the defendant appealed to this court. *Reversed*; *new trial*.

*Erica A. Barber*, assistant public defender, for the appellant (defendant).

*Laurie N. Feldman*, assistant state's attorney, with whom were *David R. Applegate*, state's attorney, *Tatiana A. Messina*, senior assistant state's attorney, and, on the brief, *Joseph T. Corradino*, state's attorney, for the appellee (state).

*Opinion*

D'AURIA, J. In Connecticut, as in all states in the union, defendants facing serious criminal charges enjoy the constitutional right to a trial by jury. See, e.g., *State v. Seekins*, 299 Conn. 141, 158, 8 A.3d 491 (2010). The sixth and fourteenth amendments to the United States constitution, and article first, §§ 8 and 19, of the Connecticut constitution[1] reflect "a fundamental decision

---

[1] Article first, § 8, of the Connecticut constitution, as amended by article seventeen of the amendments, guarantees defendants "in all prosecutions by information . . . a speedy, public trial by an impartial jury." Article first, § 19, of the Connecticut constitution provides that "[t]he right of trial by jury shall remain inviolate." Connecticut safeguards these rights, but "[t]here is no right to trial by jury in criminal actions where the maximum penalty is a fine of one hundred ninety-nine dollars or in any matter involving violations payable through the Centralized Infractions Bureau where the maximum penalty is a fine of five hundred dollars or less." General Statutes § 54-82b (a).

about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges." (Internal quotation marks omitted.) *State* v. *Langston,* 346 Conn. 605, 634, 294 A.3d 1002 (2023), cert. denied,      U.S.    , 144 S. Ct. 698, 217 L. Ed. 2d 391 (2024). As we have recognized, notwithstanding the silence of these constitutional provisions on the subject, the United States Supreme Court has interpreted the right to a " 'trial by an impartial jury' " to include the "unmistakable" requirement of a unanimous jury verdict before a defendant may be found guilty. *State* v. *Douglas C.,* 345 Conn. 421, 435–36, 285 A.3d 1067 (2022), quoting *Ramos* v. *Louisiana,* 590 U.S. 83, 89–90, 140 S. Ct. 1390, 206 L. Ed. 2d 583 (2020).

Defendants may, of course, waive their constitutional right to a jury trial and instead elect a trial to the court. See General Statutes § 54-82 (a).[2] Before accepting a defendant's waiver, the trial court must find it to be undertaken knowingly, intelligently, and voluntarily. See, e.g., *State* v. *Gore,* 288 Conn. 770, 778, 955 A.2d 1 (2008). Most cases in which a defendant waives the right to a trial by jury result in a trial before a single judge, who rules on evidentiary and legal questions, but also finds facts and arrives at a final verdict. See 6 W. LaFave et al., Criminal Procedure (4th Ed. 2015) § 24.6 (a), pp. 570–71. However, Connecticut provides a distinct alternative in one category of cases. By virtue of two statutory provisions, when a defendant charged with any crime punishable by life imprisonment, with or without the possibility of release, elects a court trial, "the court shall be composed of three judges . . . .

---

[2] General Statutes § 54-82 (a) provides: "In any criminal case, prosecution or proceeding, the accused may, if the accused so elects when called upon to plead, be tried by the court instead of by the jury; and, in such case, the court shall have jurisdiction to hear and try such case and render judgment and sentence thereon."

Such judges, or a majority of them, shall have power to decide all questions of law and fact arising upon the trial and render judgment accordingly." General Statutes § 54-82 (b); see also General Statutes § 53a-45 (b). Our research and that of the parties have found these statutes to be unique among the fifty states, not only because they expand the traditional court trial from a single judge to a panel of three judges but because they require only two of the three judges to arrive at a verdict and to render judgment.[3] These provisions depart from the requirement of a unanimous verdict, which is a hallmark of the right to a criminal jury trial in Connecticut and throughout the nation. See *State* v. *Douglas C.*, supra, 345 Conn. 435–36.

In the present case, the defendant, Larise N. King, waived her right to a jury trial and elected to be tried to a three judge court, *Richards*, *Hernandez* and *Dayton*, *Js.*, on charges of murder as an accessory in violation of General Statutes §§ 53a-8 and 53a-54a, and conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a. Two members of the court, *Hernandez* and *Dayton*, *Js.*, found the defendant guilty on both counts and rendered judgment accordingly. The third member of the court, *Richards*, *J.*, dis-

---

[3] Connecticut's statutory three judge panel appears to be distinct in the nation in that it may find a defendant guilty with only two of the three judges needed to reach that decision. Among the fifty states, Ohio's statute governing trials to a three judge panel is most analogous to § 54-82 (b), providing that, if an accused charged with an offense punishable by death waives the right to a jury trial, "he shall be tried by a court to be composed of three judges, consisting of the judge presiding at the time in the trial of criminal cases and two other judges . . . . The judges or a majority of them may decide all questions of fact and law arising upon the trial . . . ." Ohio Rev. Code Ann. § 2945.06 (West 2020). Although Ohio's statute permits a majority of a three judge panel to resolve questions throughout the proceedings, the statute draws a line when it comes to finding a defendant guilty: "the accused shall not be found guilty or not guilty of any offense unless the judges unanimously find the accused guilty or not guilty." Ohio Rev. Code Ann. § 2945.06 (West 2020).

sented and instead would have found the defendant guilty of accessory to manslaughter in the first degree as a lesser included offense of the crime of murder and conspiracy to commit assault in the first degree as a lesser included offense of the crime of conspiracy to commit murder.

The defendant now appeals, arguing that (1) there was insufficient evidence to support the judgment of conviction, (2) the failure of the trial court, *Russo, J.*,[4] to explain that the three judge panel did not have to reach a unanimous decision rendered her jury trial waiver involuntary and, thus, unconstitutional, and (3) three judge panels should be prohibited from deliberating until the close of evidence and the submission of the case to the panel, which, the defendant claims, improperly occurred in the present case. Although we conclude that sufficient evidence supported the majority's guilty verdict, we invoke our supervisory authority over the administration of justice and hold that trial courts must canvass defendants who choose to be tried before a three judge panel, rather than before a jury, to ensure that they understand that, although a jury of their peers must be unanimous in reaching a guilty verdict, a three judge panel can properly arrive at a guilty verdict after a decision by a majority vote. The failure of the canvassing court in the present case to explain that critical difference to the defendant requires that we reverse her conviction and remand the case for a new trial. Finally, because the issue may arise at a retrial, we also hold that a three judge panel is not constitutionally prohibited from beginning its deliberations prior to the close of evidence and the submission of the case to the panel because, although judges are not immune from the frailties of human nature, they

---

[4] We refer to Judge Russo in this opinion as the canvassing judge or the canvassing court.

are held to a higher standard and serve a different role as compared with jurors.

I

The pertinent facts found by the three judge panel, along with the relevant procedural history, can be summarized as follows. The defendant married the victim, Dathan Gray, in 2016. Numerous family members testified that the couple's relationship had been turbulent from the beginning of the marriage. The defendant and Gray separated approximately two years later.

At the time of the murder, the defendant and Gray were both dating other people, and their relationship remained volatile. They often fought via Facebook. Notably, six months before the events in question, the defendant streamed live on Facebook with a message for Gray. In the video, the defendant stated that she would "kick [Gray's] ass" whenever she saw him and that "whatever my family do to you is beyond me . . . . They tired of you."

On the night of July 26, 2019, Gray was working a shift at The Snack Shack in Bridgeport. At about 11:17 p.m., Gray's supervisor called the defendant and asked her to come to the store and "take care of" Gray, who was "drunk" and "acting up . . . ." The defendant's best friend, Janice Rondon, drove the defendant to The Snack Shack. Once there, Rondon initially stayed in the car while the defendant and Gray talked outside of his apartment, which was directly across the street from The Snack Shack. After some time, Rondon got out of the car and approached the defendant and Gray. When Rondon approached, Gray stated: "Why the fuck you over here? Mind your own fucking business, bitch." Gray tried to spit on Rondon, and Rondon spat back at him, triggering an argument and a physical fight between the defendant and Gray. Onlookers, including numerous friends and acquaintances of the defendant

and Gray, remembered there having been a "commotion," with punches thrown and the defendant and Gray rolling on the ground. Nosadee Sampson, a longtime friend of the defendant and Gray, recalled the defendant having told Gray that he was "going to breathe his last breath." Michael Edwards, the defendant's boyfriend at the time, deescalated the situation by separating the defendant from Gray.

At about 1 a.m. on July 27, 2019, Gray and his girlfriend at the time, Sakeryial Beverly, were talking on the sidewalk down the street from The Snack Shack. Sampson, who was standing next to Beverly, saw two men wearing hoodies approach, which struck her as odd because of how hot it was that night. She shouted to Gray that the men wearing hoodies were approaching him, but the men quickly pushed Beverly to the side and shot Gray in the face. Bridgeport's "Shot Spotter" system registered sixteen gunshots in the area at approximately 1:13 a.m. Forensic and medical reports indicate that Gray had sustained eleven gunshot wounds and four graze gunshot wounds. Doctors pronounced Gray dead shortly after his arrival at Bridgeport Hospital.

Sampson could not see what the men wearing hoodies looked like, remembering only that one was taller than the other. She saw the men exchange words with Gray but did not hear the conversation. Sampson testified that the defendant was not one of the shooters.

Sampson also testified that the defendant was wearing a light colored shirt, striped pants, and a printed scarf on the night of the murder. The defendant admitted this when interviewed by the police. Upon reviewing surveillance video of the area, police officers noticed that, at 12:59 a.m., a light colored sport utility vehicle (SUV) picked up a woman matching this description. At about 1:10 a.m., the SUV parked approximately 0.14

miles away from where Gray was murdered. The video depicted two men wearing hoodies getting out of the vehicle. After they exited the SUV, the woman moved from the rear passenger seat into the driver's seat to back up the vehicle. The SUV's headlights were off, but the rear brake lights remained illuminated after the woman backed up the SUV, indicating that her foot was on the brake. Once the men returned to the SUV, the woman turned on the headlights and drove away. Two minutes and twenty-two seconds had elapsed from when the men exited the SUV to when they returned to the SUV.

The defendant first spoke to a police detective on July 28, 2019, about Gray's death. The defendant admitted that she had punched Gray in the face during the evening before the shooting but denied telling him that he would take his last breath. She also maintained that she was at home when the shooting occurred. Following this interview, police detectives reviewed the surveillance video and determined that the license plate number of a white Ford Explorer depicted in the footage had the same features as the SUV near the scene of Gray's death. After checking the license plate number, the police determined that the Ford Explorer was registered to the defendant's cousin, Oronde Jefferson.[5]

On August 1, 2019, police detectives went to the defendant's home to interview her again. Several of the defendant's family members, including her mother and aunt, were present during the interview. Although the defendant's recollection of events on the night in question was largely the same as the version of events she had given the police on July 28, 2019, she added that she had called Edwards because she wanted him to fight Gray. When asked whether she knew anyone who

---

[5] We note that, throughout the record, Oronde's name has been spelled differently, either as "Oronde" or "Arondae."

owned a white Ford Explorer, the defendant initially stated that she did not. When the detectives mentioned that the surveillance video depicted her entering a white Ford Explorer, she acknowledged that Jefferson owned a similar SUV. She then admitted that Jefferson and one of his friends had picked her up in Jefferson's vehicle on the night of Gray's death. Andrew Bellamy, a friend of Jefferson's, corroborated this statement.[6] The defendant also told the detectives that she did not call Jefferson that night but that they had "linked up out of the blue . . . ." Phone records, however, revealed that, shortly before the shooting at 1:13 a.m., the defendant called Jefferson four times, at 12:44, 12:45, 12:46 and 12:51 a.m., and that, during those calls, her cell phone accessed a cell site in the vicinity of the shooting scene.

The defendant was arraigned on September 23, 2019, and initially invoked her right to a jury trial. On February 5, 2021, the defendant appeared before the canvassing court, waived her right to a jury trial and elected to be tried by a three judge court. During its canvass of the defendant to determine if her waiver was being made knowingly, intelligently and voluntarily, the court explained that, if she elected a court trial, a three judge panel would hear evidence and decide her case. The court did not explain that the panel did not need to be unanimous to find her guilty and that it could do so after a decision by only a majority of the three judges.

After five days of trial before the three judge panel, the case was submitted to it for deliberations on the

---

[6] Bellamy was subpoenaed to testify before the court but invoked his fifth amendment privilege against self-incrimination. The prosecutor then informed the court, *Russo, J.*, of the state's intention to offer Bellamy immunity pursuant to General Statutes § 54-47a (a) and sought an order from the court to compel Bellamy to testify. The court then granted the state's request and ordered Bellamy to testify. When the three judge panel returned to the bench and trial resumed, Bellamy testified that he and Jefferson had picked up the defendant on the night in question but maintained that he was not present when Gray was murdered.

afternoon of May 4, 2021. The defendant appealed from the judgment of conviction directly to this court pursuant to General Statutes § 51-199 (b) (3). We will provide additional facts and procedural history as necessary.

II

We begin with the defendant's claim that there was insufficient evidence for the majority of the three judge court to convict the defendant of murder as an accessory and conspiracy to commit murder because, if we were to agree with her, principles of double jeopardy would prevent the state from retrying her on those charges. See, e.g., *State* v. *Robles*, 348 Conn. 1, 28, 301 A.3d 498 (2023).

In a written decision, the majority emphasized that the defendant and Gray had "regularly and publicly engaged in verbal and physical altercations," including on the night of Gray's death. Within one hour of the defendant's punching Gray in the face and saying that he would take his last breath, Gray was shot and killed. The majority found that these circumstances, combined with the inconsistencies in the defendant's statements to the police about the events leading to the murder, supported its finding that the defendant was guilty of murder as an accessory and conspiracy to commit murder. In particular, the defendant had first told the police that she was at home when the shooting occurred, that she did not know anyone who owned a white Ford Explorer, and that she had not been in communication with her cousin, Jefferson, that evening. Faced with contradictory evidence when questioned by the detectives, she changed her story. Based on the totality of the circumstances and the defendant's own admissions, the majority found that the defendant was the woman who drove the SUV away from the crime scene. The majority also emphasized that the defendant was close enough to the shooting to hear gunshots, yet she did

not flee from the scene as other onlookers did. Rather, she turned the SUV's headlights off and waited, with her foot on the brake, indicating that she was on standby and ready to leave quickly. Considering those facts, the majority stated that it was reasonable to infer that the defendant was a knowing and willing participant in the shooting of Gray.

The defendant argues that the state failed to present evidence demonstrating that she (1) aided Jefferson and Bellamy in the commission of Gray's murder, (2) possessed the requisite intent to murder Gray, and (3) entered into an agreement to kill Gray. The defendant maintains that the evidence was too speculative for a trier of fact reasonably to deduce that she had aided Jefferson and Bellamy in Gray's murder. In particular, the defendant underscores that the state has not yet charged Jefferson or Bellamy with the shooting of Gray, arguing that this demonstrates "fatal weaknesses" in the case against her. The defendant acknowledges that intent is rarely proven through direct evidence but, rather, is most often inferred from the relevant circumstances. Nonetheless, the defendant maintains that the possible inferences do not suffice to prove, beyond a reasonable doubt, that she sought to kill Gray and entered into an agreement with Jefferson and Bellamy to accomplish that objective. Specifically, the defendant argues that it is disputed whether she told Gray that it would be his last day, as she denied making the statement, and witnesses recalled the scene as being too loud to hear what words Gray and the defendant exchanged. The defendant also reasons that, under Connecticut case law, her past disputes with Gray are insufficient to prove that she intended to, and did, enter into an agreement to murder him. Finally, regarding her inconsistent accounts about what occurred in the hours before the shooting, the defendant contends that her conflicting statements fail to establish that she pos-

sessed the intent necessary to be found guilty of the charges against her.

In response, the state explains that, although Jefferson and Bellamy have not been charged in connection with the murder of Gray, this is irrelevant, as General Statutes § 53a-9 establishes that an individual may be found guilty as an accessory, even if other participants in the crime have not yet been prosecuted for the conduct at issue. The state then argues that the totality of the evidence presented was sufficient to find the defendant guilty of both murder as an accessory and conspiracy to commit murder. The state stresses that the trier could infer from the video footage that a coordinated plan was in place to kill Gray. The state agrees that the defendant's inconsistent statements alone are not enough to find her guilty of the charged crimes but maintains that reasonable inferences drawn from the testimony of witnesses as well as from exhibits admitted into evidence provided sufficient evidence of her guilt. We agree with the state.

When reviewing sufficiency of the evidence claims, this court applies a two part test. See, e.g., *State* v. *Taft*, 306 Conn. 749, 755–56, 51 A.3d 988 (2012). "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) Id. We use this same standard when considering whether sufficient evidence supported the three judge panel's guilty verdict. See *State* v. *Bennett*, 307 Conn. 758, 763, 59 A.3d 221 (2013) ("we undertake the same limited review of the panel's verdict, as the trier of fact, as we would with a jury verdict"). When this inquiry involves circumstantial evidence, "[i]t is not one fact, but the cumulative impact

of a multitude of facts which establishes guilt . . . .” (Internal quotation marks omitted.) *State* v. *Taft*, supra, 756. Intent is often inferred from “the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom” because “[d]irect evidence of the accused’s state of mind is rarely available.” (Internal quotation marks omitted.) *State* v. *Lewis*, 303 Conn. 760, 770, 36 A.3d 670 (2012). “[W]e do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [fact finder’s] verdict of guilty.” (Internal quotation marks omitted.) *State* v. *Taft*, supra, 760–61.

“To prove the offense of conspiracy to commit murder, the state must prove two distinct elements of intent: that the conspirators intended to agree; and that they intended to cause the death of another person.” *State* v. *Pinnock*, 220 Conn. 765, 771, 601 A.2d 521 (1992). In the same vein, to find a defendant guilty of murder as an accessory, the state must prove that the defendant intended to aid the principal offender and to kill the victim. See, e.g., *State* v. *Delgado*, 247 Conn. 616, 621–22, 725 A.2d 306 (1999).

The defendant contends that, because Jefferson and Bellamy have not been charged in connection with the homicide of Gray, there is a “gaping hole” in the state’s theory of the case, which renders the evidence proffered against her insufficient to find her guilty. The defendant’s assertions, however, are contrary to law. The legislature has particularly provided: “In any prosecution for an offense in which the criminal liability of the defendant is based upon the conduct of another person under section 53a-8 it shall not be a defense that . . . such other person has not been prosecuted for or convicted of any offense based upon the conduct in question . . . .” General Statutes § 53a-9; cf. *State*

v. *Colon*, 257 Conn. 587, 604, 778 A.2d 875 (2001). Although it might appear counterintuitive to charge only one individual with crimes that required the involvement of multiple individuals, doing so is legally sound, and the lack of charges against Jefferson and Bellamy does not inherently cast doubt on the sufficiency of the evidence against the defendant.

The decisions of the three judge panel diverge on whether there was sufficient evidence to conclude that the defendant possessed the requisite intent to find her guilty of conspiracy and accessory to murder. Judge Richards, in dissent, stated that he disagreed with the majority's conclusion that the state had presented sufficient evidence to prove, beyond a reasonable doubt, that the defendant had the specific intent to murder Gray. He reasoned that the evidence was adequate to support a guilty verdict of only the lesser included offenses of conspiracy to commit assault in the first degree and accessory to manslaughter in the first degree, but he did not detail why he interpreted the evidence differently from the majority. Because Judge Richards concluded that there was sufficient evidence to support a conviction of the lesser included offenses, presumably, he agreed with the majority that the evidence indicated that the defendant had intended to harm Gray, disagreeing only as to the severity of the harm she intended. This question of intent is also the crux of the sufficiency inquiry before us, but, on appeal, we view the evidence in the light most favorable to upholding the verdict. See, e.g., *State* v. *Taft*, supra, 306 Conn. 755–56. The issue does not center around what our findings would have been had we been the triers of fact; rather, we must limit our inquiry to whether there was sufficient evidence for the majority to reasonably reach its decision. See id., 756. Applying this standard of review and considering the defendant's own

statements, we hold that the state presented sufficient evidence to sustain the defendant's conviction.

Although whether the defendant told Gray on the night in question that it would be his last was disputed at trial, the fact finder reasonably could have credited Sampson's testimony that the defendant in fact said that. Moreover, it is undisputed that the defendant had punched Gray that evening and that they had a history of exchanging harsh words on Facebook, with the defendant having previously stated publicly that she would "kick [Gray's] ass . . . ." In a Facebook livestream, the defendant had implied that members of her family might come after Gray because they were tired of him. Although these statements and actions in isolation might not demonstrate specifically that the defendant took part in a coordinated conspiracy to kill Gray, they provide crucial context concerning her acrimonious relationship with him.

Rational inferences the majority could draw from the surveillance video of the defendant, who was only 0.14 miles from the crime scene, lead us to conclude that the evidence was sufficient to find that she was part of a conspiracy to murder Gray. Even though the defendant's presence, in and of itself, might not suffice to infer intent, "a defendant's knowing and willing participation in a conspiracy nevertheless may be inferred from [her] presence at critical stages of the conspiracy that could not be explained by happenstance . . . ." (Internal quotation marks omitted.) *State* v. *Rosado*, 134 Conn. App. 505, 511, 39 A.3d 1156, cert. denied, 305 Conn. 905, 44 A.3d 181 (2012). The surveillance video captured key stages of the conspiracy, including the defendant's actions immediately before, during, and after Gray's murder. Mere moments before Gray was murdered, the men wearing hoodies exited the Ford Explorer, and the defendant moved from the rear passenger seat to the driver's seat. The defendant then proceeded to turn off

the SUV's headlights; the rear brake lights, however, remained illuminated, indicating that she had her foot on the brake. As the majority stressed, rather than calling 911 or leaving the scene when she heard gunshots, the defendant remained in place, only turning on the headlights and driving away once the men wearing hoodies returned and entered the SUV. From this sequence of events combined with Gray's fraught relationship history with the defendant, the majority reasonably could have inferred that the defendant was the getaway driver, which indicated that she had the requisite intent required to find her guilty of conspiracy to commit murder and murder as an accessory. Although a fact finder would not be compelled to draw that inference (as the dissenting judge on the panel apparently did not), it is not an inference that we can overturn on appeal. See, e.g., *State* v. *Hedge*, 297 Conn. 621, 657, 1 A.3d 1051 (2010) ("factual inferences that support a guilty verdict need only be reasonable" (internal quotation marks omitted)).

The defendant's inconsistent statements about the events at issue buttress her culpability. "[M]isstatements of an accused, which a jury could reasonably conclude were made in an attempt to avoid detection of a crime or responsibility for a crime or were influenced by the commission of the criminal act, are admissible as evidence reflecting a consciousness of guilt." (Internal quotation marks omitted.) *State* v. *Moody*, 214 Conn. 616, 626, 573 A.2d 716 (1990).

Given all of the evidence in the record, the reasonable inferences that may be drawn from that evidence, and reading the record in the light most favorable to sustaining the guilty verdict, we conclude that the panel's majority could have reasonably found that the evidence was sufficient to establish the defendant's guilt for both the conspiracy and accessory to murder charges. Accordingly, we uphold the majority's verdict.

### III

The defendant was arrested on September 21, 2019. Days later, the court set bond at $1 million, and the defendant was continuously incarcerated until her trial. On January 9, 2020, a public defender entered pleas of not guilty and a jury trial election on the defendant's behalf. Not long after the onset of the COVID-19 pandemic in early 2020, state officials suspended jury trials.[7] On June 15, 2020, new counsel appeared for the defendant. On February 5, 2021, when the defendant appeared remotely by video before the canvassing court and withdrew her prior jury trial election in favor of a courtside trial, the following colloquy occurred between the court and Attorney Michael A. Peck, defense counsel:

"The Court: I understand [the defendant] was brought in here today for a couple of issues. One is the possibility of waiving her constitutional right to a jury trial and possibly electing a courtside trial. Is that still an idea, Attorney Peck?

"Attorney Peck: Yes, Your Honor, primarily because she's coming up to a year and a half, thirty-five years old and there's really no record. I don't know when I could tell her that she'll be—she'd ever have a jury trial . . . .

"The Court: I'm in no better position to do that than you are, sir."

That colloquy reflected the uncertainty facing the judiciary—and courts and other government agencies

---

[7] "COVID-19, also known as coronavirus, is a respiratory disease caused by a virus that is transmitted easily from person to person and can result in serious illness or death. . . . In 2020, the virus spread rapidly, eventually amounting to a global pandemic. . . . Government officials in Connecticut and virtually everywhere else ordered lockdowns and other measures to abate the rate of infection . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Henderson*, 348 Conn. 648, 666 n.6, 309 A.3d 1208 (2024).

throughout the nation—at that time. "At the height of the pandemic, many governmental operations had to be curtailed significantly, including jury trials." *State* v. *Henderson,* 348 Conn. 648, 666 n.6, 309 A.3d 1208 (2024). After canvassing the defendant about her decision to reject the state's pretrial plea offer, during which the court asked about her background, education, and work experience, the court then canvassed the defendant specifically about her decision to waive her right to a jury trial:

"The Court: . . . Now, statutorily, and you have a constitutional right to what we call a trial by jury, a jury of your peers, ma'am, or we'll go through the process of selecting a jury and a trial will be presented before a jury, a jury will deliberate and will arrive at verdicts. I don't know what those verdicts would be. Those verdicts could be guilty, they could be not guilty or a mix of the two. Do you understand that . . . ?

"The Defendant: Yes, sir.

"The Court: Now, you have a constitutional right and a statutory right, ma'am, to a trial by jury, do you understand that?

"The Defendant: Yes.

"The Court: Similarly, you also have a right to waive that jury trial, and you can elect for what's called a courtside trial. A courtside trial does not involve jurors, as you and I typically understand that. It would involve what we call a three judge panel, three Superior Court judges that would sit as a jury and then would have evidence presented before them, and they would arrive at verdicts, and they would perform a sentencing, if any of the verdicts resulted in a verdict of guilty. Do you understand that, ma'am?

"The Defendant: Yes, I do.

"The Court: Now, I've asked you already the questions involving your ability to understand today's hearing and your school and work history and your relationship with your attorney, Attorney Peck. So, I don't have to ask those questions again because I'm satisfied with your answers, but I do have to ask this question: would you prefer to have a jury trial, ma'am, or would you elect to waive that jury trial and would [you] rather have a trial before a three judge panel?

"The Defendant: I would waive the jury trial. I would rather have the three judge panel.

"The Court: All right, and have you had enough time to discuss that election with Attorney Peck?

"The Defendant: Yes, sir.

"The Court: Now, Attorney Peck, I turn to you, sir, and I ask you, you have consulted—your client has consulted with you on this issue. Are you satisfied, sir, that she understands the election that she has made?

"Attorney Peck: I am satisfied that she is making the election knowingly and voluntarily, yes.

"The Court: All right, anything further from the state?

"The Prosecutor: No, Your Honor.

"The Court: The [court] does find that [the defendant] has had enough time to speak with her attorney, her attorney is present, and her attorney is certainly more than competent to make the representations that he has made this morning, and I also find that [the defendant] is more than competent and understands the proceedings today and understanding—and understands the charge[s] against her, and the court does find that her choice, her election for a courtside trial rather than a jury trial is voluntarily, understandingly made and has been made with the assistance of competent counsel, and a waiver may be recorded."

That colloquy constituted the entire canvass, which the defendant challenges as inadequate because the court did not explain to her that she had a right to a trial before a twelve person jury that would have to reach a unanimous decision to find her guilty and that if she waived that right in favor of a trial to a three judge panel, that panel would not be required to be unanimous to find her guilty. Based on this omission, the defendant argues that her jury trial waiver was not knowingly and intelligently made.

Any discussion of the sufficiency of a court's canvass of a defendant seeking to waive the right to a jury trial in favor of a court trial must begin with *State* v. *Gore*, supra, 288 Conn. 770, and *State* v. *Kerlyn T.*, 337 Conn. 382, 253 A.3d 963 (2020). In *Gore*, this court held that defendants must personally and affirmatively waive their constitutional right to a jury trial. See *State* v. *Gore*, supra, 777–78. Invoking our supervisory authority, we held that, in the absence of a written waiver, trial courts must canvass defendants on the record and confirm that any jury trial waiver is knowing, intelligent, and voluntary. See id., 778. In *Kerlyn T.*, this court indicated that a canvass for a jury trial waiver need not be " 'extensive' "; *State* v. *Kerlyn T.*, supra, 393; reasoning that "competent counsel is capable of explaining [the] basic differences" between a jury trial and a court trial "sufficiently to enable a defendant to make an informed decision when selecting one over the other," including "that a jury of six or twelve, with alternates, comprised of a defendant's peers, selected with the defendant's participation, would have to be unanimous . . . ." Id., 396 n.10. We acknowledged, however, that "a reviewing court must inquire into the totality of the circumstances," including "the background, experience, and conduct of the accused" when considering whether the trial court's canvass and the defendant's jury trial waiver were sufficient. (Internal quotation

marks omitted.) Id., 392. Finally, "[a]lthough not consti-
tutionally required," we recommended that "our trial
courts elicit from a defendant proper assurances that he
or she, in fact, understands [the] differences" between
a jury trial and a trial to a court. Id., 396 n.10. We
concluded by stating: "Of course, if circumstances not
existing in the . . . case indicate a need for a more
particularized judicial explanation of the right being
waived, such as a statement by the defendant that coun-
sel has not provided a clear explanation, we recommend
that our trial courts adjust the canvass accordingly." Id.

Unlike the situations in *Gore* and *Kerlyn T.*, which
involved only noncapital charges and the waiver of a
jury trial in favor of a trial before a single judge, the
present case required "a more particularized judicial
explanation of the right being waived"; id.; as the defen-
dant was facing a charge of murder as an accessory,
which is punishable by life imprisonment. See General
Statutes §§ 53a-35a, 53a-51 and 53a-54a. She was thus
presented with the choice between electing a trial
before a twelve member jury[8] that would have to arrive
at a unanimous verdict to find her guilty or a trial before
a panel of three judges that could find her guilty (as
they did here) if only two of them agreed to do so.

The defendant argues that, under the state constitu-
tion, Judge Russo's canvass was insufficient, notwith-
standing *Gore* and *Kerlyn T.* Specifically, she stresses
that, although the courts in *Gore* and *Kerlyn T.* declined
to enumerate specific criteria for a trial court's canvass,
those cases still require that a defendant's waiver of a
constitutional right must be knowing, intelligent, and
voluntary. The defendant reasons that her waiver did
not satisfy this standard because the canvassing court

[8] A defendant is entitled to a jury of twelve when facing a charge punishable
by death, life imprisonment without the possibility of release or life imprison-
ment. For all other criminal charges, "the accused shall be tried by a jury
of six . . . ." General Statutes § 54-82 (c).

did not explain to her that a three judge panel could render a split decision. In the alternative, the defendant urges us to exercise our supervisory authority to require trial courts canvassing defendants who seek to waive the right to a jury trial to inform them that, although a jury must be unanimous to return a guilty verdict, only two judges of a three judge panel are needed to convict the defendant. The defendant claims that, because the trial court failed to inform her of that distinction, she did not grasp "essential, constitutionally protected features" of her right to a jury trial.

It is worthwhile to review the history of the statutes that have given rise to our present system, in which a defendant accused of murder may waive her right to a jury trial in favor of a trial before a three judge panel whose verdict need not be unanimous. See General Statutes §§ 53a-45 (b) and 54-82 (b). The legislature first authorized court trials in criminal cases at the election of the defendant in chapter 56 of the Public Acts of 1874, which was codified in the statutory revision of 1875 and has been carried forward into what is now § 54-82. See *McBrien* v. *Warden*, 153 Conn. 320, 328–29, 216 A.2d 432 (1966). In 1927, the legislature enacted the precursor of § 54-82 (b), chapter 107 of the 1927 Public Acts, which was later codified at General Statutes (1930 Rev.) § 6477. Chapter 107 of the 1927 Public Acts provided that, if an accused charged with a crime punishable by death or life imprisonment elected a trial to the court, a panel of three judges would hear the case[9] and that "[s]uch judges, or a majority of them,

[9] Chapter 107 of the 1927 Public Acts, which was codified at General Statutes (Rev. to 1930) § 6477, provides in relevant part: "If the accused shall be charged with a crime punishable by death or imprisonment in the state prison for life and shall elect to be tried by the court, the court shall be composed of three judges consisting of the judge presiding at the term and two other judges to be designated by the chief justice of the supreme court of errors. Such judges, or a majority of them, shall have power to decide all questions of law and fact arising upon the trial and render judgment accordingly."

shall have power to decide all questions of law and fact arising upon the trial and render judgment accordingly." Public Acts 1927, c. 107. The 1874 provision for court trials in criminal cases, as modified by Public Acts 1927, c. 107, became General Statutes (Rev. 1930) § 6043, which was amended in 1935 by General Statutes (Cum. Supp. 1935) § 1685c to include the following: "[I]f [the defendant] shall be convicted by confession, the court, to be composed of the judge presiding at the session and two other judges to be designated by the chief justice of the supreme court of errors, shall hear the witnesses in such case, and such judges, or a majority of them, shall determine the degree of the crime and render judgment and impose sentence accordingly." See *McBrien* v. *Warden*, supra, 330.

Section 53a-45 (b) likewise has deep roots in Connecticut law. The three judge court it provides for also derives from General Statutes (Cum. Supp. 1935) § 1685c, which ultimately became § 53-9 in 1958. General Statutes (1958 Rev.) § 53-9 described conduct that defined the degree of murder an accused could be charged with for purposes of trial by jury but required that an accused who instead had entered a plea of guilty be presented to a three judge panel that would determine the degree of murder committed before rendering judgment and imposing sentence. Id., 323–24.

When the legislature overhauled Connecticut's criminal statutes in Public Acts 1969, No. 828, which resulted in the enactment of the Penal Code in 1971, General Statutes (1958 Rev.) § 53-9 was repealed. The language of § 45 of Public Acts 1969, No. 828, which ultimately became what is today § 53a-45 (b), simplified matters by providing that an accused charged with murder who waived the right to a jury trial would be tried by a three judge panel that could convict the accused either unanimously or by a majority of the panel.

There is no preserved legislative history, however, that explains *why* the legislature chose to provide the option of a trial before a three judge panel as opposed to a trial before only a single judge. But see id., 329 (noting that Public Acts 1927, c. 107, was enacted when, "[i]n 1927, it came to be felt that the burden of having a murder case tried to the court . . . should not be imposed upon a single judge"). Despite this dearth of legislative history, an examination of available Connecticut cases in which criminal defendants were tried before a three judge panel is particularly informative. First, although we have encountered limits in our ability to review relevant cases,[10] our research reveals that the circumstances in the case before us are rare. In only one reported decision of this court have we considered a challenge to a nonunanimous verdict delivered by a three judge panel. In *State* v. *Bennett*, supra, 307 Conn. 760, the defendant was charged with aiding and abetting murder, felony murder, home invasion, and burglary in the first degree. When first canvassing the defendant about his waiver of the right to a jury trial, the trial court failed to explain that, although a jury of twelve of his peers could find him guilty only if it was unanimous, only two judges on a three judge panel were needed to convict him. See id., 775. The trial court found this omission significant enough that it called the

---

[10] A great number of appellate decisions involving three judge panels are silent on whether the panel was unanimous in finding the defendant guilty. See, e.g., *State* v. *Roseboro*, 221 Conn. 430, 432–33, 604 A.2d 1286 (1992). Of course, if the three judge panel voted to acquit the defendant by a nonunanimous verdict, there would almost certainly be no appeal by the state; see General Statutes § 54-96; with the result that, likely, no transcript would ever be prepared and the record would be erased. See General Statutes § 54-142a; see also *State* v. *Apt*, 319 Conn. 494, 497 n.1, 126 A.3d 511 (2015) ("[w]henever . . . the accused, by a final judgment, is found not guilty of the charge or the charge is dismissed, all police and court records and records of any state's attorney pertaining to such charge shall be erased upon the expiration of the time to file a writ of error or take an appeal" (internal quotation marks omitted)).

defendant back into the courtroom before he had left the courthouse to inform him of this unanimity distinction and to determine whether he still wished to waive his right to a jury trial.[11] Id. The three judge panel unanimously found the defendant guilty on all but one charge, with only two of the three judges finding him guilty of aiding and abetting murder. Id., 760.

Our review of reported decisions has also led us to three additional cases from this court that did not involve the claim we currently consider but nonetheless reveal the content of the trial court's canvass. See *State* v. *Rizzo*, 303 Conn. 71, 84, 31 A.3d 1094 (2011) ("Two out of three would be enough. But not—obviously, with a jury it has to be unanimous." (Internal quotation marks omitted.)), cert. denied, 568 U.S. 836, 133 S. Ct. 133, 184 L. Ed. 2d 64 (2012); *State* v. *Hafford*, 252 Conn. 274, 302 n.16, 746 A.2d 150 ("In a court trial, if you give up your right to having twelve people decide the case— twelve jurors—and elect to have the judges do it, you will have three judges and you understand that they do

---

[11] When the trial court in *Bennett* called the defendant back into the courtroom to expand on its initial canvass, defense counsel had already left the courthouse. *State* v. *Bennett*, supra, 307 Conn. 775. In counsel's absence, the defendant was accompanied by a different public defender for the second canvass to answer any questions the defendant had. The trial court addressed the defendant again and stated: "Just to tell you I forgot to ask you one question and that's why—I tried to catch [defense counsel] before he left and I missed him. But he did say that he had explained to you that with a jury verdict it's got to be unanimous with a three judge panel it does not have to be. It could be a majority, two to one. Do you understand that, sir?" (Internal quotation marks omitted.) Id. The defendant responded affirmatively. Id. Twenty days later, with the defendant and his counsel present, the court recounted on the record what had transpired at the initial canvass after defense counsel's departure and then canvassed the defendant again. Id., 776.

On appeal, the defendant argued that his jury trial waiver was insufficient because his counsel was not present when the trial court first discussed the unanimity distinction on the record. Id., 774. This court held that the defendant's jury trial waiver was valid, reasoning that the trial court's approach was appropriate under the circumstances. Id., 776.

not have to be unanimous. In other words, it could be a two-to-one. Either guilty or not guilty, whichever. You understand that?" (Internal quotation marks omitted.)), cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000); *State* v. *Cobb*, 251 Conn. 285, 368–69, 743 A.2d 1 (1999) ("[I]n a jury trial, of course, the verdict must be unanimous, all twelve would have to agree on the verdict . . . . [W]hen you have three judges, it's a majority. So it would only have to be two out of the three in order for a verdict to be rendered . . . ." (Internal quotation marks omitted.)), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). Of the reported cases in which we can review the specific canvass, the trial court included in the canvass an advisement that the three judge panel need not be unanimous to find the defendant guilty.[12]

Finally, we have undertaken a search to locate canvasses administered by trial courts throughout the state before accepting a defendant's waiver of the right to a jury trial in favor of a three judge panel, where the canvass was not recounted in any reported decision. Although this search has also had its limitations,[13] the

___

[12] At the outset of our case law review, we acknowledge this court's decision in *State* v. *Marino*, 190 Conn. 639, 641–42, 462 A.2d 1021 (1983), overruled in part by *State* v. *Chapman*, 229 Conn. 529, 643 A.2d 1213 (1994). Although the trial court's canvass of the defendant in *Marino* did not contain an advisement that the three judge panel did not have to be unanimous to find him guilty, the defendant in *Marino* raised the same claim before us in the present case, contending that his jury trial waiver was insufficient because the trial court's canvass did not describe that a jury of twelve must reach a unanimous verdict but a three judge panel needs only a simple majority to convict a defendant. Id. This court did not address the claim because the panel in *Marino* delivered a unanimous verdict. Further, *Marino* predates our decision in *Gore*, in which we invoked our supervisory authority to require that, in the absence of a written waiver, trial courts canvass defendants who seek to waive the right to a jury trial. See *State* v. *Gore*, supra, 288 Conn. 778. These realities diminish the relevance of *Marino* to the present case.

[13] In an effort to understand the precise language that trial courts typically use when canvassing defendants about how three judge panels function, we have reviewed as many relevant transcripts as were available to us.

results of this search have nonetheless been illuminating.

Of the three judge panel cases for which we have located documentation, we have been able to review the transcripts in seven cases in addition to *State* v. *Marino*, 190 Conn. 639, 462 A.2d 1021 (1983), overruled in part by *State* v. *Chapman*, 229 Conn. 529, 643 A.2d 1213 (1994), *Bennett*, *Rizzo*, *Hafford*, *Cobb* and the present case. The trial courts in five of those seven cases explicitly advised the defendants that, if they elected a trial before a three judge court, the panel's verdict need not be unanimous.[14] None of these canvasses took place prior to 2016. See *State* v. *Maharg*, Superior Court, judicial district of Danbury, Docket No. DBD-CR-19-0159438-S (December 2, 2022) (Even though defense counsel told the trial court that she had advised the defendant of the unanimity distinction off the record, the trial court confirmed that distinction on the record, stating to the defendant, "I mean, it's really two out of three [in] that situation, versus you need all [twelve] at a jury trial. Do you understand that?" Transcript of September 19, 2022, pp. 2–3), appeal filed, Connecticut Supreme Court,

However, practical barriers have limited our search. First, we were able to review documentation in cases no older than 2016. Second, except in unusual circumstances, the Judicial Branch generates transcripts only when a party files an appeal, and, even then, transcripts are prepared only for the proceedings that a party requests. See footnotes 10 and 14 of this opinion. For example, a defendant who does not challenge the voluntariness of his waiver of a jury trial might not order a transcript of the proceeding in which that canvass occurred. These logistical hurdles significantly narrowed the number of transcripts we could access. Nonetheless, among the transcripts we did review, we found striking the regularity with which trial courts advised defendants that the panel does not need to be unanimous under §§ 53a-45 and 54-82.

[14] In one of those seven cases, *State* v. *Samuolis*, 344 Conn. 200, 278 A.3d 1027 (2022), we were unable to determine whether the trial court described the unanimity distinction between trial to a jury and trial to a three judge panel, as the transcripts the defendant ordered in that case did not include the proceeding at which he waived the right to a jury trial and elected to be tried before a three judge panel.

Docket No. SC 20855 (July 17, 2023); *State* v. *Moore*, Superior Court, judicial district of New Haven, Docket No. NNH-CR-15-0157986-T (March 29, 2019) ("If it's [eleven] for guilty and one for not guilty or one who cannot vote for guilty, it's not a guilty verdict . . . . In a three judge panel . . . two out of three would be enough for a guilty verdict." Transcript of September 10, 2018, pp. 4–5), aff'd sub nom. *State* v. *Leroya M.*, 340 Conn. 590, 264 A.3d 983 (2021); *State* v. *Alexander*, Superior Court, judicial district of New Haven, Docket No. NNH-CR-16-0167203-T (January 29, 2019) ("In other words, as opposed to [twelve] jurors having to unanimously find you guilty, with [a] three judge panel, only two judges have to find you guilty. Do you understand that?" Transcript of December 5, 2018, p. 4), aff'd, 343 Conn. 495, 275 A.3d 199 (2022); *State* v. *Weathers*, Superior Court, judicial district of Fairfield, Docket No. FBT-CR-15-0283568-T (December 5, 2016) ("Also, I just want to point out one difference between a jury trial and a trial to three judges is that, in a jury trial, any verdict of the jury has to be unanimous. They all have to agree to any verdict on any charge, whether the verdict is guilty or not guilty." Transcript of November 29, 2016, p. 8), aff'd, 188 Conn. App. 600, 205 A.3d 614 (2019), aff'd, 339 Conn. 187, 260 A.3d 440 (2021); *State* v. *Watson*, judicial district of New Haven, Docket No. NNH-CR-13-0142561-T (September 29, 2016) ("So, you understand you're giving up [twelve] people that unanimously would have to find you guilty, as opposed to two out of three judges." Transcript of August 30, 2016, p. 3), aff'd, 195 Conn. App. 441, 225 A.3d 686, cert. denied, 335 Conn. 912, 229 A.3d 472 (2020).[15]

---

[15] We take judicial notice of the trial court transcripts in *Maharg*, which appeal is pending before this court, and *Moore, Alexander, Weathers* and *Watson*. See, e.g., *State* v. *Gore*, 342 Conn. 129, 139 n.9, 269 A.3d 1 (2022) ("[t]here is no question . . . concerning our power to take judicial notice of files of the Superior Court, whether the file is from the case at bar or otherwise" (internal quotation marks omitted)).

We have often stated that our supervisory powers " 'are an extraordinary remedy' "; *Marquez* v. *Commissioner of Correction*, 330 Conn. 575, 608, 198 A.3d 562 (2019); to be invoked sparingly and only "to enunciate a rule that is not constitutionally required but that we think is preferable as a matter of policy." (Internal quotation marks omitted.) *State* v. *Medrano*, 308 Conn. 604, 630, 65 A.3d 503 (2013); see also *State* v. *Pouncey*, 241 Conn. 802, 813, 699 A.2d 901 (1997) (noting that supervisory authority "is not a form of free-floating justice, untethered to legal principle" (internal quotation marks omitted)). Typically, that means we will consider whether to exercise our supervisory authority only after determining that neither the federal nor the state constitution mandates the proposed rule. However, "we on several previous occasions have declined to address a defendant's constitutional claim precisely because we elected to exercise our supervisory authority." *State* v. *Rose*, 305 Conn. 594, 606, 46 A.3d 146 (2012).

In the present case, as in *Rose*, we decline to address the defendant's constitutional claim because we have elected instead to exercise our supervisory authority— and to ultimately grant relief—for two related reasons. First, as discussed previously, we invoked our supervisory authority in *Gore* to require that trial courts canvass defendants on the record to confirm that their waiver of the right to a jury trial is made knowingly, intelligently, and voluntarily. See *State* v. *Gore*, supra, 288 Conn. 778. Second, the rule that the three judge panel's verdict does not have to be unanimous stems from a statute that appears to be unique in the nation and which, having been enacted into law by the legislature, could be amended by the legislature. Accordingly, we see less utility in addressing the defendant's state constitutional claim that the trial court's canvass of her should have included a discussion of unanimity. See, e.g., *State* v. *Patel*, 342 Conn. 445, 455 n.6, 270 A.3d 627

("the jurisprudential policy of constitutional avoidance" directs "courts to decide a case on a nonconstitutional basis if one is available, rather than unnecessarily deciding a constitutional issue"), cert. denied,    U.S.    , 143 S. Ct. 216, 214 L. Ed. 2d 86 (2022).

We are mindful that "the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers." (Internal quotation marks omitted.) *State* v. *Anderson*, 255 Conn. 425, 439, 773 A.2d 287 (2001). "Thus, a defendant seeking review of an unpreserved claim under our supervisory authority must demonstrate that his claim is one that, as a matter of policy, is relevant to 'the perceived fairness of the judicial system as a whole,' most typically in that it lends itself to the adoption of a procedural rule that will 'guide the lower courts in the administration of justice in all aspects of the criminal process.' . . . In our view, adherence to this unifying principle mitigates against the specter of arbitrary, result oriented, and undisciplined jurisprudence that may be a potential risk of the expansive use of our supervisory powers." (Citations omitted; footnote omitted.) *State* v. *Elson*, 311 Conn. 726, 768–71, 91 A.3d 862 (2014).

It is not unusual for us to exercise our supervisory authority to direct trial courts to undertake a particular canvass of individuals before they waive certain rights. In addition to *Gore*, we invoked our supervisory authority in *Duperry* v. *Solnit*, 261 Conn. 309, 803 A.2d 287 (2002), to require that, when a defendant "pleads not guilty by reason of mental disease or defect, and the state substantially agrees with the defendant's claim of mental disease or defect . . . the trial court must canvass the defendant to ensure that his plea is made voluntarily and with a full understanding of its consequences." Id., 329. In *State* v. *Connor*, 292 Conn. 483, 973 A.2d 627 (2009), we invoked our supervisory authority to require that, "upon a finding that a mentally

ill or mentally incapacitated defendant is competent to stand trial and to waive his right to counsel at that trial, the trial court must make another determination, that is, whether the defendant also is competent to conduct the trial proceedings without counsel." Id., 518–19. Most recently, in *In re Yasiel R.*, 317 Conn. 773, 120 A.3d 1188 (2015), we directed that, in all parental termination proceedings, trial courts must canvass the respondent parent prior to the start of the trial to ensure that the respondent fully understands his or her rights that are protected under law.[16] Id., 795. In *In re Yasiel R.*, we stated that, "by exercising our supervisory authority . . . we are promoting public confidence in the process by ensuring that all parents involved in parental termination proceedings fully understand their right to participate and the consequences of the proceeding." Id., 794–95.

Although our search for and examination of trial court canvasses of defendants who have waived their right to a jury trial in favor of three judge panels cannot possibly be complete in light of the lengthy history of the statute, we find the sample size of recent cases to be significant for the task at hand. This review of available case law and transcripts supports a conclusion that it is more than a common practice, but a nearly unanimous practice, for trial courts to refer specifically

---

[16] Specifically, in *In re Yasiel R.*, we held that the canvass in termination of parental rights proceedings must cover "(1) the nature of the termination of parental rights proceeding and the legal effect thereof if a judgment is entered terminating parental rights; (2) the respondent's right to defend against the accusations; (3) the respondent's right to confront and cross-examine witnesses; (4) the respondent's right to object to the admission of exhibits; (5) the respondent's right to present evidence opposing the allegations; (6) the respondent's right to representation by counsel; (7) the respondent's right to testify on his or her own behalf; and (8) if the respondent does not intend to testify, he or she should also be advised that if requested by the petitioner, or the court is so inclined, the court may take an adverse inference from his or her failure to testify, and explain the significance of that inference." *In re Yasiel R.*, supra, 317 Conn. 795.

to the possibility of a split verdict, as permitted by §§ 53a-45 and 54-82. In fact, as in *Bennett,* ensuring that the record manifests a defendant's understanding that a three judge panel's verdict does not have to be unanimous, although a jury's verdict must be unanimous, was important enough that one experienced trial judge called the defendant back into the courtroom to make clear that he understood this critical difference. See *State* v. *Bennett,* supra, 307 Conn. 775. We still believe that, as we said in *Kerlyn T.,* competent counsel is more than capable of explaining the "basic differences" between a jury trial and a court trial, but Connecticut's unique statutory scheme exists in a national landscape where a unanimous jury verdict is part and parcel of a defendant's sixth amendment right to a jury trial. *State* v. *Kerlyn T.,* supra, 337 Conn. 396 n.10; see also *Ramos* v. *Louisiana,* supra, 590 U.S. 96. Given this context, we cannot categorize the lack of unanimity specifically permitted in three judge panel cases under §§ 53a-45 (b) and 54-82 (b) as a "basic [difference]" that can be left to counsel to explain to a defendant. *State* v. *Kerlyn T.,* supra, 396 n.10; see, e.g., *Ramos* v. *Louisiana,* supra, 107 (nonunanimous verdicts have not "become part of our national culture" (internal quotation marks omitted)). We therefore conclude that we should exercise our supervisory authority to require that trial courts, when canvassing defendants who want to waive their right to a jury trial in favor of a three judge panel, specifically advise those defendants that, unlike a twelve person jury that must arrive at a unanimous verdict, only two members of a three judge panel need to agree to convict a defendant. This mandatory canvass "is preferable as a matter of policy"; *State* v. *Rose,* supra, 305 Conn. 606; and is necessary to "the perceived fairness of the judicial system as a whole . . . ." (Internal quotation marks omitted.) *State* v. *Elson,* supra, 311 Conn. 768. That so many trial judges have included such

critical information about the tribunal as part of their canvasses convinces us that failing to do so contributes to a perception of arbitrariness in our judicial system rather than inspiring confidence that our courts, "in the administration of justice in all aspects of the criminal process," will treat all defendants equally, no matter the circumstances they encounter. (Internal quotation marks omitted.) Id.

Having decided to exercise our supervisory authority to require such a canvass, our inquiry is not quite finished. We must decide whether this new rule should apply to the present case, resulting in a reversal of the judgment of conviction in this case. Cases in which this court has invoked its supervisory authority "can be divided into two different categories. In the first category are cases [in which] we have utilized our supervisory power[s] to articulate a procedural rule as a matter of policy, either as holding or dictum, but without reversing convictions or portions thereof. In the second category are cases [in which] we have utilized our supervisory powers to articulate a rule or otherwise take measures necessary to remedy a perceived injustice with respect to a preserved or unpreserved claim on appeal." Id., 768 n.30; accord *State* v. *Carrion*, 313 Conn. 823, 850, 100 A.3d 361 (2014). "Our cases have not always been clear as to the reason for this distinction." *State* v. *Diaz*, 302 Conn. 93, 107 n.11, 25 A.3d 594 (2011). But "a review of the cases in both categories demonstrates that, in contrast to the second category, the first category consists of cases [in which] there was no perceived or actual injustice apparent on the record, but the facts of the case lent themselves to the articulation of prophylactic procedural rules that might well avert such problems in the future." *State* v. *Elson*, supra, 311 Conn. 768–69 n.30. "[W]e will reverse a conviction under our supervisory powers only in the rare case [in which] fairness and justice demand it. . . . [The issue

at hand must be] of [the] utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Internal quotation marks omitted.) *State* v. *Reyes*, 325 Conn. 815, 823, 160 A.3d 323 (2017); accord *State* v. *Turner*, 334 Conn. 660, 687, 224 A.3d 129 (2020). "For purposes of the second category of cases—cases in which we reverse a conviction—the defendant must establish that the invocation of our supervisory authority is truly necessary because '[o]ur supervisory powers are not a last bastion of hope for every untenable appeal.' " *State* v. *Carrion*, supra, 851; see also *State* v. *Patterson*, 276 Conn. 452, 470, 491, 886 A.2d 777 (2005) (reversing judgment where trial court declined to instruct jury regarding credibility of jailhouse informant who had been promised benefit in exchange for his testimony).

Our review of the record in the present case, as well as the canvasses provided to defendants in the vast majority of relevant cases that we have been able to examine, convinces us that "fairness and justice demand" that we reverse the defendant's conviction. See *State* v. *Reyes*, supra, 325 Conn. 823. We therefore announce today a rule that defendants electing to waive their right to a jury trial in favor of a trial before a three judge panel must be advised by the court, on the record, that only two of the three judges have to agree to convict them, in contrast to a jury of twelve, which must agree unanimously in reaching a guilty verdict. The defendant in the present case did not receive the benefit of this admonition, waiving her right to a jury trial during a virtual hearing that she attended from the detention center where she had been incarcerated for eighteen months. She then found herself on the losing end of a two-to-one verdict in one of only two nonunanimous verdicts we have been able to locate by a three judge panel and the only nonunanimous verdict involving a

murder charge. We have no trouble concluding that this issue is "of [the] utmost seriousness . . . ." (Internal quotation marks omitted.) *Marquez* v. *Commissioner of Correction*, supra, 330 Conn. 608. In *Gore*, we invoked our supervisory authority in a similar fashion to require trial courts to canvass defendants about their choice to waive the right to a jury trial and then concluded that we must reverse the defendant's conviction and remand the case for a new trial. See *State* v. *Gore*, supra, 288 Conn. 787–88, 790. For the "integrity of [the defendant's] particular trial but also for the perceived fairness of the judicial system as a whole"; *State* v. *Elson*, supra, 311 Conn. 765; we conclude that we must reverse the defendant's conviction and remand the case for a new trial[17] to remedy "a perceived or actual injustice . . . ." Id., 768 n.30.

## IV

Although we have reversed the defendant's conviction and remanded the case for a new trial, because the defendant's final claim is likely to arise at a new trial, we will review it. See, e.g., *State* v. *Juan A. G.-P.*, 346 Conn. 132, 158, 287 A.3d 1060 (2023). In particular, the defendant claims that the three judge panel violated her due process rights because it began deliberations prior to the close of evidence and the submission of the case to the panel. Her claim is in part legal and in part factual. Legally, she asks that we extend our holding in *State* v. *Washington*, 182 Conn. 419, 421, 438 A.2d 1144 (1980), in which we established a constitutional prohibition against jury deliberations until the close of evidence and the submission of the case to the fact finder, to cases involving three judge panels. Factually, the defendant asserts that she has adequately

---

[17] On remand, the defendant will be entitled to a canvass in accordance with this opinion prior to her election of whether to have her case retried before a jury or a three judge panel.

established that the three judge panel engaged in premature deliberations. Particularly, the defendant argues that she has established a "prima facie claim of premature deliberations" based on "the short time frame from the submission of the case to publication of the decision on the merits (less than twenty-four hours)" and that she is therefore entitled to a remand of the case to develop a fuller factual basis to support her claim pursuant to *State* v. *Castonguay*, 194 Conn. 416, 436, 481 A.2d 56 (1984). She also argues that this court should order the three judge panel to respond to her motion for augmentation and rectification of the record, in which she sought details as to the timing and extent of the three judge panel's deliberations. See footnotes 18 and 19 of this opinion and accompanying text.

In its brief, the state did not respond to the defendant's legal argument, and, when asked repeatedly at oral argument before this court, its appellate counsel expressly declined to take a position as to whether the prohibition established in *Washington* should extend to three judge panels. Instead, the state contends that the defendant failed to establish the factual basis required for us to review her claim that the three judge panel did, in fact, engage in presubmission deliberations. The state also contends that this court should not remand the matter to the three judge panel to develop the facts more fully because the defendant's motion for rectification improperly sought to add new information to the record.

As we will explain, we disagree with the defendant's legal argument that *Washington*'s prohibition on presubmission deliberations should extend to three judge panels. Because of this conclusion, we need not address the parties' arguments about whether to remand the case to the three judge panel for further factual development or to respond to the defendant's request regarding her motion for rectification because, even if we assume,

without deciding, that the three judge panel engaged in presubmission discussions, we conclude that such discussions are not constitutionally prohibited.

The following additional procedural history is relevant to this claim. The evidentiary portion of the trial occurred on April 27, 28, 29 and 30, and May 3, 2021. The parties introduced more than 100 exhibits and elicited the testimony of fifteen witnesses. On May 4, the parties presented closing arguments, the three judge panel heard the playback of certain testimony and then recessed for the day at 5 p.m.[18] Between 11:39 a.m. and 12:06 p.m. on May 5, both the majority and the dissenting judge orally announced their findings of fact, conclusions, and verdicts. At 12:32 p.m., the dissenting judge issued a one page decision that contained findings and conclusions that also were identical to those in his oral decision. At 2:39 p.m. on the same day, the majority issued a twelve page decision, the findings and conclusions of which were identical to those it had announced orally earlier that day.

While this appeal was pending, the defendant filed a motion for rectification of the record, requesting that the panel disclose the manner and scope of any deliberations it had engaged in before the case was submitted for decision. The defendant's motion was motivated by the panel's ability to review the evidence, deliberate, and compose detailed memoranda of decision within twenty-four hours. The state opposed the motion. After hearing arguments, the three judge panel denied the motion for rectification.[19]

---

[18] The specific timing of these activities derives from the three judge panel's denial of the defendant's motion for rectification of the record, in which the judges stated that they had spoken with the courtroom monitor, who consulted the electronically time-stamped contemporaneous notations. See footnote 19 of this opinion.

[19] The three judge panel did not explicitly confirm or deny that it had engaged in presubmission deliberations but, instead, denied the motion because it sought extraordinary relief not sanctioned by our rules of practice and, in the panel's view, sought to intrude on its deliberative processes. In

We have not had occasion, until now, to consider whether the prohibition in *Washington* on presubmission deliberations by juries applies to three judge panels. To our knowledge, we are the first court in the country to be asked to answer this question. As previously described, § 54-82 (b) is one of a kind in that it permits defendants accused of "a crime punishable by death, life imprisonment without the possibility of release or life imprisonment" to elect to be tried before a three judge panel.[20] Accordingly, we review our reasoning in *Washington* to determine whether to extend it to the present case.

In *Washington*, a jury found the defendant guilty of felony murder, and he appealed from his conviction to this court, raising a constitutional challenge to the trial

its memorandum denying rectification, the three judge panel stated that "the court began its deliberations at 12:25 p.m." on May 4. As support for this statement, the three judge panel indicated that it had spoken with the courtroom monitor, who consulted the electronically time-stamped contemporaneous notations. That does not, however, conclusively establish whether the panel did or did not discuss the evidence before the case was submitted to it for decision.

The defendant sought reconsideration of the denial of her motion for rectification, which the three judge panel denied. The defendant then asked this court for review of the three judge panel's denial of her motion for rectification. We granted review but denied the relief requested without prejudice to allow the parties to renew their arguments in their briefs to this court. In accordance with our order on the defendant's motion for review, the parties' briefs focus on whether the denial of rectification was proper. We do not opine on that issue because we reject the defendant's legal claim that *Washington*'s prohibition on presubmission deliberations by a jury does not extend to three judge panels.

[20] Other states have statutes authorizing three judge panels, but none of those statutes is congruent with § 54-82. See footnote 3 of this opinion; see also N.Y. City Crim. Ct. Act §§ 40 and 42 (repealed 1971); Pa. R. Crim. P. 319A (b). States such as Alaska and Nebraska provide for a three judge panel for sentencing. See, e.g., Alaska Stat. § 12.55.175 (2012); Neb. Rev. Stat. § 29-2520 (3) (Cum. Supp. 2022). Finally, § 20-18-101 of the Tennessee Code mandates that a three judge panel be convened to hear and determine civil actions challenging, inter alia, the constitutionality of a statute, executive order, or administrative regulation. See Tenn. Code Ann. § 20-18-101 (West 2021).

court's jury instructions. *State* v. *Washington*, supra, 182 Conn. 420. Specifically, he claimed that "the trial court's instructions early in the trial granting the jurors permission to discuss in the jury room the evidence heard daily before the termination of the case deprived him of due process under the federal and state constitutions." (Emphasis omitted.) Id., 421. We observed that neither the jurors' oath contained in General Statutes (Rev. to 1973) § 1-25 nor Practice Book (1978–97) § 850 (now § 42-14) prohibited jurors from discussing the evidence prior to the case being submitted to them, and that the "source of the prohibition of such discussions" derived from the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution, which afford the defendant the right to trial by an impartial jury. Id., 424–25.[21] We held that the jury's impartiality is hindered by presubmission deliberations and concluded that it is "improper for jurors to discuss [the] case among themselves until all the evidence has been presented, counsel have made final arguments, and the case has been submitted to them after final instructions by the trial court." Id., 425. We set aside the conviction and ordered a new trial because the trial court's instructions improperly "authorized and encouraged [the jury] to give premature consideration to the evidence presented—consideration unaided by the final instructions of the trial court as to the law to be applied to the facts in the case." Id., 426, 429.

To support this new constitutional rule, we recognized in *Washington* that "it is human nature that an individual, having expressed in discussion his or her view of the guilt or innocence of the defendant, would

---

[21] Although the court in *Washington* relied on the constitutional right to a fair and impartial jury, it is equally true that a defendant has a constitutional right to a trial before an impartial judge. See, e.g., *Tumey* v. *Ohio*, 273 U.S. 510, 535, 47 S. Ct. 437, 71 L. Ed. 749 (1927).

be inclined thereafter to give special attention to testimony strengthening or confirming the views already expressed to fellow jurors. . . . Because the prosecution presents its evidence first, initial expressions of opinion would generally be unfavorable to the defendant. . . . Also, the human mind is constituted so that what one himself publicly declares touching any controversy is much more potent in biasing his judgment and confirming his predilections than similar declarations which he may hear uttered by other persons. When most men commit themselves publicly to any fact, theory, or judgment they are too apt to stand by their own public declarations, in defiance of evidence. This pride of opinion and of consistency belongs to human nature." (Citations omitted; internal quotation marks omitted.) Id., 426. Likewise, "[o]nce a juror has expressed an opinion on key evidence to his [fellow jurors], the die may well have been cast. . . . [S]uch a person may believe that he will be regulated by testimony, but the law suspects him, and certainly not without reason. He will listen with more favor to that testimony which confirms, than to that which would change his opinion; it is not to be expected that he will weigh evidence or argument as fairly as a man whose judgment is not made up in this case." (Internal quotation marks omitted.) Id., 428.[22]

Accordingly, "[t]he principal evils of permitting premature discussion by jurors are that the jurors may

---

[22] Following *Washington*, we consistently have reaffirmed the constitutional prohibition on jury discussion prior to the final submission of the case. See, e.g., *Sawicki* v. *New Britain General Hospital*, 302 Conn. 514, 521–22, 29 A.3d 453 (2011); *State* v. *Newsome*, 238 Conn. 588, 627, 682 A.2d 972 (1996); *Spitzer* v. *Haims & Co.*, 217 Conn. 532, 545, 587 A.2d 105 (1991); *State* v. *Castonguay*, supra, 194 Conn. 434. Although an instruction permitting jurors to discuss the case before its submission to them constitutes reversible error, not all juror discussion prior to submission automatically requires a new trial. See *State* v. *Castonguay*, supra, 434. Rather, if, on appeal, there is an indication that the jurors engaged in presubmission discussions, we will remand the case to the trial court for an evidentiary hearing to determine whether that impropriety constituted harmless error. See id., 436.

thereby consider evidence unaided by the court's instructions, and that a juror who has expressed his opinion publicly to his fellow jurors may become irretrievably committed to that point of view despite evidence to the contrary." *Spitzer* v. *Haims & Co.*, 217 Conn. 532, 545, 587 A.2d 105 (1991); see *State* v. *Washington*, supra, 182 Conn. 426. We are not persuaded that these evils plague the presubmission deliberations of a three judge panel.

First, as the defendant's appellate counsel conceded at oral argument before this court, judges are aware of the applicable law prior to the final submission of the case, unlike jurors, who must be instructed. See, e.g., *State* v. *Reynolds*, 264 Conn. 1, 29 n.21, 836 A.2d 224 (2003) ("[i]n the absence of any evidence to the contrary, '[j]udges are presumed to know the law . . . and to apply it correctly' "), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). Thus, discussion among judges while a trial is ongoing does not pose a risk that their views will be skewed by their lack of knowledge of the legal standards governing their decision. See *State* v. *Davis*, 63 Ohio St. 3d 44, 48, 584 N.E.2d 1192 ("[j]udges are trained and expected to disregard any extraneous influences in deliberations"), cert. denied, 506 U.S. 858, 113 S. Ct. 172, 121 L. Ed. 2d 119 (1992). For example, because judges are aware of the rules of evidence, we presume that, when acting as triers of fact, they consider only properly admitted evidence when rendering their decision. See, e.g., *State* v. *Roy D. L.*, 339 Conn. 820, 842, 262 A.3d 712 (2021). Likewise, we have recognized that "judges, who, unlike jurors, are well versed in the rules that govern the arguments of counsel during a trial, are also less likely to be influenced by improper comments or arguments made by counsel during a [court] trial." Id., 844. Jurors, on the other hand, do not hear the evidence with a legal framework in mind and must refrain from deliberating

until after they are instructed by the court at the end of the trial about how the law mandates that they evaluate and weigh the evidence that was presented to them. See *State* v. *Washington*, supra, 182 Conn. 426. In short, we trust judges—sworn constitutional officers and legal professionals whose everyday job is to preside in a courtroom—if they choose to discuss the case prior to the close of evidence because their deliberations are not hampered by their lack of knowledge of how the law will govern their ultimate decision.

Second, we reject the suggestion that presubmission deliberations would result in the judges of a panel refusing to change their initial position. We trust judges to be true to their oaths, training, and role as neutral arbiters to resolve matters in an impartial and unbiased manner. See, e.g., *Munn* v. *Hotchkiss School*, 326 Conn. 540, 577, 165 A.3d 1167 (2017); *State* v. *Milner*, 325 Conn. 1, 12, 155 A.3d 730 (2017); see also General Statutes § 1-25 (prescribing judicial oath and juror oath). To be sure, judges are human beings. They might have initial reactions to evidence, reactions that they might even share with their colleagues on the panel. Judges would violate their duty as neutral arbiters, however, if those initial impressions caused them to become closed-minded, or if they failed to properly engage in the deliberative process. See Code of Judicial Conduct, Rule 2.2 ("[a] judge shall uphold and apply the law and shall perform all duties of judicial office fairly and impartially"); Code of Judicial Conduct, Rule 2.2, comment (1) ("[t]o ensure impartiality and fairness to all parties, a judge must be objective and open-minded"). We have confidence in the judges of a panel to resist the inclination that might overcome legally untrained laypersons and allow presubmission deliberations to affect their ultimate conclusions. Unlike jurors, judges are experienced legal professionals who are highly sensitive to the risk of prejudgment and acutely aware that they

are bound by the highest standards of impartiality. See, e.g., *Ponns Cohen* v. *Cohen*, 342 Conn. 354, 362, 270 A.3d 89 (2022) (recognizing that "judges are human" but also that "*judges are held to the highest of standards*" (emphasis added)).

Moreover, there is an important and stark difference between a juror's and a judge's responsibilities in our system of justice. Unlike a jury, the sole purpose of which is to serve as a fact finder; see *Maldonado* v. *Flannery*, 343 Conn. 150, 160, 272 A.3d 1089 (2022); a judge on a three judge panel serves a hybrid role as fact finder and legal arbiter. See, e.g., *Saleh* v. *Ribeiro Trucking, LLC*, 303 Conn. 276, 282, 32 A.3d 318 (2011). As part of this hybrid role, judges may be required to begin assessing and discussing the evidence prior to the final submission of the case to them in the likely event that the panel is required to make legal rulings prior to the close of evidence. See, e.g., *State* v. *Watson*, supra, 195 Conn. App. 444 (three judge panel denied defendant's motion for judgment of acquittal filed after conclusion of state's case); see also *State* v. *Crespo*, 246 Conn. 665, 670, 718 A.2d 925 (1998) (same), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999).

Of course, nothing in our decision today *requires* that the members of a three judge panel engage in presubmission deliberations. There might be good reasons for the judges of the panel to agree, prior to trial, to abstain from deliberations until the final submission of the case. We cannot say, however, that a three judge panel's presubmission deliberations would be unconstitutional because that would require us to assume that the judges would violate their oaths and the Code of Judicial Conduct, which "strikes at the very core of judicial integrity and tends to undermine public confidence in the established judiciary." (Internal quotation marks omitted.) *State* v. *D'Antonio*, 274 Conn. 658, 672,

877 A.2d 696 (2005). We rely on trial judges every single day to resolve factual and legal disputes with open minds, and we remain confident that they will continue to do so even if they are permitted to discuss the evidence as it is presented with their fellow panel members.[23] If the defendant has a specific factual basis to assert that the impartiality of a member of a three judge panel might reasonably be questioned, the defendant may move to disqualify the judge pursuant to Practice Book § 1-23. See, e.g., *State* v. *Milner*, supra, 325 Conn. 4–5. Without this specific factual basis, we are not persuaded that we must extend *Washington*'s blanket constitutional prohibition on presubmission jury deliberations to three judge panels.

In sum, the defendant has not offered us a compelling reason to adopt a constitutional prohibition on the three judge panel's presubmission deliberations. We therefore decline to extend *Washington* to cases involving three judge panels.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.

––––––––––––––––––––––

[23] Notwithstanding our conclusion that there is no constitutional prohibition on a three judge panel's discussing the case before the close of evidence, we note that the better practice is to avoid deliberating on the ultimate issue of the defendant's guilt or innocence until the case is formally submitted to the panel.